662 A.2d 308

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RIGOBERTO MEJIA, A/K/A MARTIN GAMEZ,
DEFENDANT–APPELLANT.

Argued October 24, 1994—Decided July 12, 1995.

Jacqueline E. Turner and Abby P. Schwartz, Assistant Deputy Public Defenders, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney).

Mark P. Stalford, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor, attorney; Stacy H. Gaffney, Assistant Prosecutor, on the brief).

Deborah Bartolomey, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (Deborah T. Poritz, Attorney General, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, Rigoberto Mejia, also known as Martin Gamez, and the victim, Balbino Garcia, were undocumented workers employed at the Breakers Hotel in Spring Lake. Mejia had entrusted Garcia with $750 from Mejia's earnings. When Mejia learned that Garcia was about to leave the United States, Mejia demanded the return of the money. Although Garcia had placed $1,201 in his eye-glass case, he denied possession of Mejia's money. After a dispute, Garcia fled down a basement hallway. Mejia fired a single shot, which struck Garcia in the back. A short time later, Garcia died. The State claimed the shot was purposeful; Mejia claimed it was accidental.

At trial, the critical issue was whether Mejia had intended to kill Garcia. The trial court instructed the jury that to find defendant

guilty of capital murder, it must unanimously find that he had so intended. The court, however, failed to charge that to find Mejia had intended to cause only serious bodily injury resulting in death, the jury need not be unanimous. That omission was critical. At the time of the offense, a defendant who intended to cause serious bodily injury, but not death, was not subject to the death penalty. *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988). On the facts, the erroneous charge constitutes reversible error.

The jury convicted Mejia of capital murder and related offenses. We affirm Mejia's conviction for murder, but reverse the imposition of the death penalty. On remand, if the State elects not to seek the death penalty, Mejia's murder conviction will stand, and the Law Division shall sentence him under *N.J.S.A.* 2C:11–3b. If the State elects to seek the death penalty, all convictions will be vacated and the State may re-try him for murder and all other offenses.

-I-

The record, which includes Mejia's statement to the police, reveals the following facts. Defendant did not testify at either the guilt- or penalty-phase hearings. In the summer of 1991, Mejia and Garcia were co-workers at the Breakers, sharing a room in the hotel basement until Mejia was fired. Before leaving, Mejia asked Garcia to safeguard his savings of $750 "in case of emergency so that it would be protected."

After moving to Brooklyn, Mejia called Garcia several times to recover his money. Garcia, however, did not return the money, and Mejia learned that Garcia intended to return to Mexico before Christmas. In fact, Garcia planned to return on December 8, 1991, on a 7:00 a.m. flight. Three hours before the flight, Mejia, armed with a .357 magnum and accompanied by an accomplice armed with a knife, confronted Garcia in the hotel basement.

Garcia "spoke badly to [Mejia] and pushed his way out of the room and ran down the hall." Mejia pursued Garcia into a bedroom occupied by Garcia's brother-in-law and nephew and

pointed his handgun at the three men. According to Mejia's statement, Mejia "didn't want to kill [Garcia]" and threatened Garcia with the pistol to scare him. Garcia tried to take the pistol from Mejia, who struck Garcia with the gun, fracturing Garcia's skull.

Garcia fled down the hallway with Mejia in pursuit. Mejia claims that he slipped while chasing Garcia and accidentally fired the gun. According to the State's ballistic expert, the gun was fired within one-half inch of the victim's back. As Garcia lay dying, he told his girlfriend that Mejia had shot him.

Three days later, Garcia's nephew called the police after observing Mejia walking along the boardwalk in Belmar. When the police arrested Mejia, he was carrying a .357 magnum with five cartridges in its six-cartridge chamber. A State Police ballistics expert determined that the bullet taken from Garcia's body had been fired from Mejia's gun.

A Monmouth County Grand Jury charged Mejia with murder, in violation of *N.J.S.A.* 2C:11–3; felony murder, in violation of *N.J.S.A.* 2C:11–3a(3); armed robbery, in violation of *N.J.S.A.* 2C:15–1; aggravated assault, in violation of *N.J.S.A.* 2C:12–1b; possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a; and unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39–5b. The prosecutor served a notice of aggravating factors specifying that Mejia had committed the murder during a felony, *N.J.S.A.* 2C:11–3c(4)(g) ("the c(4)(g) factor").

The jury convicted Mejia on all counts. At the penalty phase, the jury found that defendant had committed the murder during a felony. Mejia relied on *N.J.S.A.* 2C:11–3c(5)(h), which lists as a mitigating factor "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense" ("the catch-all factor"). Of the eight mitigating factors specified by Mejia, the jury unanimously found two factors because Mejia's father had physically and mentally abused him as a child. Five jurors found that Mejia had suffered emotional depri-

vation during his childhood. Three found a non-specific catch-all factor. The jury unanimously found that the single aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Consequently, the jury sentenced Mejia to death.

On the non-capital offenses, the court sentenced Mejia: for armed robbery, twenty years without parole eligibility to run consecutively to the death sentence; for aggravated assault, ten years with a five-year period of parole ineligibility; for possession of a weapon for an unlawful purpose, ten years with a five-year period of parole ineligibility; and for unlawful possession of a weapon, a concurrent five-year term with two and one-half years of parole ineligibility.

-II-

Defendant urges as plain error the trial court's failure to instruct the jury that it could return a non-unanimous verdict that he intended only to cause serious bodily injury. *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. We agree. We also find that the evidence provides a rational basis for a jury to find that defendant intended only to cause serious bodily injury. Accordingly, we reverse defendant's death sentence and remand for imposition of a non-capital-murder sentence. On remand, if the State should seek the death sentence, the murder conviction must be vacated and the murder count retried. *See State v. Purnell,* 126 *N.J.* 518, 543, 601 *A.*2d 175 (1992) (vacating capital sentence but permitting State to re-try murder count on remand); *State v. Dixon,* 125 *N.J.* 223, 229, 593 *A.*2d 266 (1991) (vacating death sentence and remanding for imposition of non-capital murder sentence); *State v. Long,* 119 *N.J.* 439, 504–05, 575 *A.*2d 435 (1990) (discussing effect of partial criminal reversal and whether reversal of capital-murder count requires reversal of any other related count).

-A-

The intent to cause serious bodily injury, like the intent to kill, can establish the requirement that a murder is "knowing" or

"purposeful" under *N.J.S.A.* 2C:11–3a. Because of recent constitutional and statutory amendments, *P.L.* 1993, *c.* 111 (signed May 5, 1993), murderers who intend to commit serious bodily injury, like those who intend to kill, are death-eligible. At the time of defendant's offense, however, only a defendant who intended to kill would be subject to a death sentence. *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. Accordingly, the trial court should have instructed the jury to distinguish between finding that defendant intended to kill and that he intended to inflict serious bodily injury.

After defining "purposeful" and "knowing," the trial court instructed the jury:

> And so your inquiry as to this form of murder will be has the State proved, beyond a reasonable doubt, that the defendant knowingly caused the death of the victim, Mr. Garcia. If you are unanimously so satisfied, then you will indicate that on the verdict sheet and return a verdict of guilty to purposely or knowingly causing the death of the victim.
>
> If you're not satisfied, you will so indicate on the verdict sheet and return a verdict of not guilty to purposely or knowingly causing the death of the victim.

The trial court then proceeded to define "the other form of murder":

> The next inquiry is with regard to the other form of murder under the statute. If you're satisfied, beyond a reasonable doubt, that the defendant either purposely or knowingly caused the death of the victim, then you don't have to answer the other question as to that second form of murder. But if your decision is that he's not guilty of purposely or knowingly causing the death of the victim, then you must consider now whether the defendant purposely or knowingly caused serious bodily injury to the victim which resulted in the death.

Essentially, the court required the jury to deliberate sequentially and to acquit defendant of "intent to kill" murder before reaching the issue of "serious bodily injury" murder. The court later emphasized:

> And so you make the following determination with regard to [the murder count] of the indictment: One, how do you find the defendant on the charge that on or about December 8, 1991 he purposely or knowingly caused the death of the victim, Balbino Garcia. If your verdict is guilty to that particular question, then you don't have to consider any of the other issues that are involved in count one that are on the verdict sheet, and I'll go over that with you shortly.

But if you determine that the State has failed to prove that, beyond a reasonable doubt, and then you consider the following question: How do you find the defendant on the charge that on or about 12/8/91, he purposely or knowingly caused serious bodily injury resulting in the death of Balbino Garcia. And if your answer to that question is guilty, then you don't have to consider aggravated manslaughter or reckless manslaughter.

Reflecting the sequential charge, the verdict sheet provided in relevant part:

1. How do you find the defendant Rigoberto Mejia on the charge that on or about December 8, 1991 he did purposely or knowingly cause the death of Balbino Garcia?

 If your verdict is GUILTY to the above question, you need not answer any of the following questions with regard to Count One, and you may now go on to consider Count Two.

2. How do you find the defendant Rigoberto Mejia on the charge that on or about December 8, 1991 he did purposely or knowingly cause serious bodily injury resulting in the death of Balbino Garcia?

 If your verdict is GUILTY to the above question # 2, you need not answer any of the following questions with regard to Count One, and you may now go on to consider Count Two.

While reading the verdict sheet, the trial court reemphasized that the jury need not consider any other possible verdicts on the murder count unless it first acquitted defendant of "intent to kill" murder.

-B-

█ The instructions contain several crucial defects. First, the sequential charge exercised a potentially coercive effect on the jury. Second, the charge did not adequately inform the jury that its determination of defendant's mental state could also determine whether he would live or die. Most significantly, the jury charge did not provide the jury with the option of convicting defendant of purposeful or knowing murder without unanimously agreeing on defendant's mental state.

We recently addressed the issue of sequential charges in *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990). In *Coyle*, the trial court instructed the jury that it could not consider the offense of passion/provocation manslaughter without first acquitting the defendant of murder. We held that the trial court's "instruction had

the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter." *Id.* at 222, 574 *A*.2d 951. We observed that "[j]uries are consistently told not to consider the lesser-included offenses unless they first find the defendant not guilty of the greater offense." *Id.* at 223, 574 *A*.2d 951. Although sequential charges can provide an orderly framework for considering lesser-included offenses, such charges should not be used in cases involving passion/provocation manslaughter, which is not a lesser-included offense of knowing and purposeful murder. *Ibid.*

Likewise, serious-bodily-injury murder is an alternative form of homicide, not a lesser-included offense of "intent to kill" murder. *See Long, supra,* 119 *N.J.* at 450, 575 *A*.2d 435 (holding that murder statute created two *forms* of murder); *Dixon, supra,* 125 *N.J.* at 252, 593 *A*.2d 266 (1991) (same); John M. Cannel, *New Jersey Criminal Code, Annotated,* comment 13 to *N.J.S.A.* 2C:1–8(e) (1994) ("Though no form of murder is, technically, a lesser-included of any other, in a capital case, where there is support in the evidence for a non-capital murder conviction, the jury must be given every opportunity to convict of the charge not carrying the death penalty."). Under *N.J.S.A.* 2C:11–3a, murder is defined as a criminal homicide committed by an actor who knowingly or purposely intends to cause death or serious bodily injury resulting in death. Thus, one who kills with either intent is a murderer. At the time of the homicide in question, however, only an actor who killed with the intent to cause death would be subject to the death penalty.

Our assessment of the prejudicial capacity of a sequential charge is grounded in the "circumstances of the case." *State v. Zola,* 112 *N.J.* 384, 406, 548 *A*.2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). One problem with a sequential charge is that it may cause a jury that believes a defendant guilty of something to convict on the first and most serious charge. *See United States v. Tsanas,* 572 *F*.2d 340, 345 (2d Cir.), *cert. denied,* 435 *U.S.* 995, 98 *S.Ct.* 1647, 56 *L.Ed.*2d 84

(1978) (stating when one element of offense is doubtful, but defendant is plainly guilty of some offense, jury likely to resolve doubts in favor of conviction). By treating serious-bodily-injury murder as a lesser-included offense, the subject charge reduced the likelihood that the jury would consider whether defendant intended to cause only serious bodily injury. Thus, by not informing the jury about the effect of its determination of defendant's mental state, the charge enhanced the likelihood that the jury would find that defendant had intended to cause death.

 As we have repeatedly stated, trial courts, particularly in capital cases, must inform juries of the legal effect of their findings. *See State v. Bey II*, 112 *N.J.* 123, 164–65, 548 *A.*2d 887 (1988) (*Bey II*) (finding that failure to instruct jury about death consequences of finding one or more aggravating factors and no mitigating factors constituted reversible error); *State v. Ramseur*, 106 *N.J.* 123, 316, 524 *A.*2d 188 (1987) (holding that trial court must "make absolutely certain the jury is aware, not simply of the consequences of its actions, but of its total responsibility for the judgment"); *cf. Roman v. Mitchell*, 82 *N.J.* 336, 345, 413 *A.*2d 322 (1980) (finding that where comparative negligence is applicable, court must inform jury about the ultimate outcome of its determination of parties' percentage comparative fault); *Dimogerondakis v. Dimogerondakis*, 197 *N.J.Super.* 518, 519, 485 *A.*2d 338 (Law Div.1984) (same). In the guilt phase of the present case, the court should have told the jury that its determination of defendant's mental state would predetermine whether defendant was subject to the death penalty. Specifically, the court should have instructed the jury that if it found that defendant had intended to kill the victim, he would be subject to the death penalty. Conversely, the court should have told the jury that if it found that defendant had intended to cause serious bodily injury, he would be subject to life imprisonment with thirty-years parole ineligibility. The failure to inform the jury of the difference, which could have "diluted the jury's responsibility for the imposition of the death penalty," *Bey*

*II, supra,* 112 *N.J.* at 164, 548 *A.2d* 887, constitutes reversible error.

-C-

The most serious error was that the instructions foreclosed the jury from reaching a guilty verdict on the murder count without unanimously agreeing on defendant's mental state. Contrary to the State's contention, if the jury unanimously found that defendant committed homicide with the intent either to cause death or to cause serious bodily injury, but could not unanimously decide which mental state defendant possessed, this finding would result in a non-capital conviction. The finding would not, as the State asserts, result in a hung jury.

The State argues that such a result would violate the "bedrock principles of jury unanimity and proof beyond a reasonable doubt." We disagree. A jury need not agree unanimously on a defendant's mental state when a finding on one of several alternative mental states will satisfy the relevant statutory requirement.

Our conclusion that the court should inform the jury of the option to return a non-unanimous verdict on a defendant's mental state follows our recent holding that a trial court must provide the jury with the option of returning a non-unanimous verdict when determining whether the defendant had committed murder by his or her own conduct. *State v. Bobby Lee Brown,* 138 *N.J.* 481, 514, 651 *A.2d* 19 (1994). In *Brown,* we held "that the proper approach is for trial courts to inform juries in capital cases of their option to return a non-unanimous verdict on whether the defendant committed the murder by his own conduct." *Id.* at 518, 651 *A.2d* 19.

Like the "by your own conduct" requirement, the "intent to kill" requirement " 'is not an element of the offense of murder [but is] merely a triggering device for the death-penalty phase of the trial.' " *Gerald, supra,* 113 *N.J.* at 99, 549 *A.2d* 792 (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576, 504 *A.2d* 804 (Law Div.1985)). For this reason,

[a]lthough a jury verdict that a defendant committed murder [with the intent to kill] must be unanimous, unanimity is not required to support a verdict that a defendant guilty of murder [committed the murder with the intent to cause serious bodily injury]. Rather, the inability of the jury to reach a unanimous decision of the [intent to kill] determination constitutes a final verdict that results in the imposition of a sentence of imprisonment of at least a thirty-year mandatory term, pursuant to *N.J.S.A.* 2C:11–3b.

[*Brown, supra,* 138 *N.J.* at 511, 651 *A.*2d 19.]

Contrary to the State's argument, the unanimity requirement redounds to the benefit of the defendant, not the State. As we explained in *Bey II, supra,* 112 *N.J.* at 159, 548 *A.*2d 887, "[t]he unanimity requirement extends only to verdicts adverse to the defendant, and the Legislature may provide for the return of a verdict favorable to the defendant on less than unanimity."

Here, at the end of the charge, the trial court instructed the jury: "Now this is a criminal case, your verdict has to be unanimous. All twelve of you deliberating must agree." The court also instructed the jury that they must decide, beyond a reasonable doubt, whether defendant intended to kill or to cause serious bodily injury. Consistent with the charge, the verdict sheet does not inform the jurors that they have an option to return a non-unanimous, or reasonably-doubtful, finding on the distinction between the intent to kill and to cause serious bodily injury. The court erred by instructing the jury that to avoid sentencing defendant to death, it must unanimously find that defendant intended only serious bodily injury.

-D-

The State argues alternatively that the error was harmless. It contends that the court need not have given a *Gerald* charge because the evidence does not provide a rational basis for the jury to find that defendant intended only serious bodily injury. Again, we disagree.

As we have previously stressed, jury instructions are "crucial in a capital case because of the jury's responsibility to decide whether a defendant shall live or die." *Id.* at 162, 548 *A.*2d 887.

Moreover, a "trial court commit[s] prejudicial error by instructing the jurors to engage in further deliberations in terms that strongly impel[ ] them to reach a unanimous verdict." *Ramseur, supra,* 106 *N.J.* at 305, 524 *A.*2d 188. As we stated in *Ramseur,*

such instructions cannot be considered harmless error because "errors which impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation. .. A defendant confronted with this kind of trial error need not demonstrate actual prejudice in order to reacquire his right to a fair trial."

[*Id.* at 312, 524 *A.*2d 188 (quoting *State v. Czachor,* 82 *N.J* 392, 404, 413 *A.*2d 593 (1980)).]

The charges in the present case impermissibly coerced the jury by requiring it to return a unanimous verdict on defendant's state of mind.

In appropriate cases, we have found the failure to give a *Gerald* charge to be harmless when the evidence did not provide a rational basis for a finding that the defendant intended only serious bodily injury. The defendant's actions in those cases, however, were so wantonly brutal that the jury could have concluded only that the defendant intended to cause death. *See, e.g., State v. Bey III,* 129 *N.J.* 557, 579, 610 *A.*2d 814 (1992) (defendant stomped on victim with sufficient force to crush her chest); *State v. Biegenwald III,* 126 *N.J.* 1, 18, 594 *A.*2d 172 (1991) (defendant fired four gunshots to victim's head); *State v. McDougald,* 120 *N.J.* 523, 558–60, 577 *A.*2d 419 (1990) (defendant slashed victims' throats, bludgeoned one victim with a baseball bat, and expressed intent to kill victims before and after killings); *State v. Hightower,* 120 *N.J.* 378, 412–14, 577 *A.*2d 99 (1990) (defendant shot victim at close range in chest, neck, and head, and then dragged victim into freezer); *State v. Rose,* 120 *N.J.* 61, 63–64, 576 *A.*2d 235 (1990) (defendant fired twelve-gauge, sawed-off shotgun point-blank into victim's stomach); *State v. Pitts,* 116 *N.J.* 580, 614–20, 562 *A.*2d 1320 (1989) (defendant threatened to kill victims two days before murder, inflicted twenty-five to thirty stab wounds with a combat knife, cut one victim's throat twice, and paused to take victim's pulse to verify death); *State v. Hunt,* 115 *N.J.* 330, 374–77, 558

A.2d 1259 (1989) (defendant stated intent to kill immediately prior to stabbing victim twenty-four times).

In contrast, the failure to give a *Gerald* charge constitutes reversible error whenever the evidence is minimally adequate to provide a rational basis for the jury to hold a reasonable doubt that the defendant intended to cause death. *See, e.g., Pitts, supra,* 116 *N.J.* at 615, 562 *A.*2d 1320 (characterizing rational-basis standard as a "low threshold"); *State v. Pennington,* 119 *N.J.* 547, 561, 575 *A.*2d 816 (1990) (same).

As we have stressed,

[a]lthough it might seem probable that the jury had intentional murder in mind, the question is whether there is a rational basis in the evidence on which the jury, if instructed to distinguish the two, might return a verdict of serious-bodily-injury murder. If there is, then the jury, as the finder of fact, must decide the matter. An appellate court cannot.

[*State v. Harvey,* 121 *N.J.* 407, 413, 581 *A.*2d 483 (1990), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991).]

Although the rational-basis test requires more than a mere "scintilla of the evidence," it has a low threshold. *State v. Crisantos,* 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986). A rational basis may exist, although the jury is likely to reject the defendant's theory. In *State v. Harris,* 141 *N.J.* 525, 662 *A.*2d 333 (1995), also decided today, we find the failure to give a *Gerald* charge to constitute harmless error. The facts in that case, however, suggest that when Harris shot the victim in the back of the neck, most likely while the victim was handcuffed and lying on the ground, that the shooting was intentional, and that Harris was practically certain that death would result.

The facts in the instant case, however, provide a rational basis for a charge that defendant intended to cause only serious bodily injury. Mejia confronted the victim about the return of his money. As Mejia explained in his statement to the police, when the victim denied possession of the money, Mejia hit him on the head with the gun, "[b]ecause I didn't want to use the gun...." The initial attack, although criminal, is consistent either with an intent to kill or to cause serious bodily injury. Mejia states that

he slipped as he pursued the victim and that the gun accidentally discharged. He fired a single shot, after which the victim lingered long enough to talk with his girlfriend. Mejia consistently has asserted that he did not intend to kill the victim. To the contrary, he has stated that the firing was accidental. We acknowledge that defendant's statement that the killing was accidental differs from the proposition that he intended to cause only serious bodily injury. With so much at stake, however, we cannot draw overly fine distinctions when analyzing a defendant's mental state. Our examination of the record persuades us that the jury could have found either that the killing was accidental, that defendant intended to kill, or that he intended to cause serious bodily injury.

As we stated in *Pennington, supra,* 119 *N.J.* at 562, 575 *A.*2d 816, "[t]o the extent that the evidence sufficed to support a charge that defendant acted recklessly, it raised the possibility that he did not intend to cause death." We explained that "[g]iven the inherent ineffability of mental states, the determination of defendant's specific intent is best left to the jury." *Id.* at 563, 575 *A.*2d 816. Consequently, we held that the trial court, which had found a rational basis for charging aggravated and reckless manslaughter, also should have charged the jury on serious-bodily-injury murder. So here, we find that the jury should have been given the option of finding that defendant had intended to cause only serious bodily injury when he killed the victim.

Consequently, we reverse defendant's death sentence. That disposition moots many of defendant's arguments. Consequently, we will address only those issues that may affect a retrial.

-III-

Mejia contends that the trial court should have charged the jury that if it found that he had sought to recover his money under a claim of right, it could find him not guilty of robbery. We disagree.

On the State's case, a police officer read into evidence Mejia's statement to the police. The statement indicated that Garcia

owed Mejia $750 that Mejia had entrusted to him for safekeeping. Mejia stated further that he went to the Breakers Hotel to "collect the money [Garcia] owed me," and that he threatened Garcia with a gun "so he would give me the money." According to Mejia, neither he nor Garcia had bank accounts because they feared that account records might lead to disclosure of their status as undocumented workers.

Consistent with his statement that he was seeking to recover his own money, Mejia requested a claim-of-right charge. The statutory basis for such a charge is:

> c. Claim of right. It is an affirmative defense to prosecution for theft that the actor:
>
> (1) Was unaware that the property or service was that of another;
>
> (2) Acted under an honest claim of right to the property or service involved or that he had a right to acquire or dispose of it as he did..
>
> [*N.J.S.A.* 2C:20–2.]

In its guilt-phase charge, the trial court, however, charged that Mejia was not entitled to a claim-of-right defense:

> Now, even if you find that the Defendant was trying to collect a monetary debt he claims the victim owed to him, you may still find him guilty of robbery, if you find that the Defendant used or threatened the use of force. Since it is unlawful to use force or the threat of force to collect a debt. The use of force or threats to collect a monetary debt, even if legitimately there is legitimate debt, is unlawful.

Before the penalty phase, counsel renewed her request for a claim-of-right instruction. Her point was that if the jury had found that defendant was attempting to recover his own money, not rob Garcia, that finding could have affected the jury's decision to impose the death penalty. The trial court denied the request, explaining that the claim-of-right defense is available only when a defendant had attempted to reclaim specific property, but not when he had attempted to collect a debt. The court found further that the evidence did not support Mejia's argument that at the time of the homicide he was attempting to reclaim the specific parcel of money that he had entrusted to Garcia.

Mejia claims that the "anti-claim-of-right" charge in the guilt phase constitutes reversible error. He argues further that the court's repetition of the charge during the penalty phase foreclos-

ed the jury from considering the effect of the surrounding circumstances on the mitigating or aggravating factors.

Although the Appellate Division has recognized the claim-of-right defense to a charge of robbery, we have not addressed the issue. We now hold that a defendant charged with robbery is not entitled to an affirmative defense of claim of right. We also find that the trial court erred in the penalty phase by precluding the jury from considering as a mitigating factor evidence of Mejia's honest belief that he was recovering his own money.

-A-

The common law defined robbery generally as theft of property from the victim by force or by putting the victim in fear of immediate bodily injury. *See State v. Cottone*, 52 *N.J.Super.* 316, 323, 145 *A*.2d 509 (App.Div.1958), *certif. denied*, 28 *N.J.* 527, 147 *A*.2d 305 (1959); *see also* 77 *C.J.S. Robbery* § 2 (1994) (listing elements of common law robbery); 67 *Am.Jur.*2d *Robbery* §§ 1, 12 (1985) (same). Common law robbery consisted of the combination of the common law crimes of assault and larceny. *State v. McDonald*, 91 *N.J.L.* 233, 236, 103 *A*. 165 (E. & A.1918) (holding that robbery consists of combination of theft and actual or threatened injury); 77 *C.J.S. Robbery* § 2 n. 14 (1994) (holding that robbery said to be combination of assault and larceny); 67 *Am. Jur.*2d *Robbery* § 9 n. 3 (1985) (stating that robbery is customarily viewed as aggravated form of larceny). Robbery, like larceny and the equivalent statutory offense of theft, requires proof of the defendant's larcenous intent. *See* 2 *Frank G. Schlosser, Criminal Laws of New Jersey* § 92:5 (3d ed. 1970) ("To constitute robbery the property must be taken with larcenous intent, i.e. with intent to steal it."); 77 *C.J.S. Robbery* § 11 (1994); 67 *Am.Jur.*2d *Robbery* § 17 (1985). Absent proof of the specific intent to steal, a defendant cannot be found guilty of robbery. *Ibid.*

When adopting the *New Jersey Code of Criminal Justice* (the Code), the Legislature intended to " 'revise and codify the [criminal] law in a logical, clear and concise manner.' " Daniel Louis

Grossman, *The New Jersey Code of Criminal Justice: Analysis and Overview,* 3 *Seton Hall Legis. J.* 1, 1 (1977) (quoting *N.J.S.A.* 1:19–4). Patterned after the *Model Penal Code* (MPC), the Code abolished all common law crimes, *N.J.S.A.* 2C:1–5, including robbery. In determining whether the defense of claim-of-right applies to robbery, we must ascertain the intent of the Legislature. Hence, we turn to the language and legislative history of the Code's provisions pertaining to robbery, theft, and the claim-of-right defense.

-B-

*N.J.S.A.* 2C:15–1a defines robbery:

A person is guilty of robbery if, in the course of committing a theft, he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree.

The statute defines "in the course of committing a theft" to include attempts to commit theft and immediate flight after an attempted or completed theft. *Ibid.* By so defining "theft," the Legislature broadened the common law definition of "robbery." The Legislature further broadened the common law definition by providing that the requisite force, although less than that needed for an assault, could satisfy the requirement of "injury" and "force." One authority explains: "The phrase 'or uses force' broadens the definition of robbery to include situations without threat or injury, such as 'the blindside muggings typical of many purse-snatchings.'" Cannel, *supra,* at 351 (quoting *State v. Carlos,* 187 *N.J.Super.* 406, 412, 455 *A.*2d 89 (App.Div.1982), *certif. denied,* 93 *N.J.* 297, 460 *A.*2d 693 (1983)).

The MPC expressly links robbery and theft, differentiating the two offenses only by requiring the use or threat of force as an element of robbery. Thus, the MPC implies that robbery and theft share the same requirement of criminal intent. *See* David Kleinhans, Note, *Robbery in Illinois: A Proposal to Reinstate the*

*Element of Specific Intent,* 27 *J. Marshall L.Rev.* 819, 842 (1994) (stating that MPC does not distinguish theft from robbery on basis of defendant's mental state). Most state statutes, like the MPC, define robbery as a specific-intent crime. *See id.* at 844 n. 202; *see also, e.g., Ala.Code* § 13A–8–43 (1982) (defining robbery as offense that involves theft); *Ark.Code Ann.* § 5–12–102 (Michie 1987) (declaring that robbery must occur in course of committing theft); *Conn.Gen.Stat.* § 53a–133 (1985) (stating that robbery must occur in course of committing larceny); *Del.Code Ann.* tit. 11, § 831 (1987 & Supp.1992) (defining robbery as an offense that occurs in the course of committing a theft); *Ga.Code Ann.* § 16–8–40 (Harrison 1990) (listing intent to commit theft as statutory requirement for robbery conviction); *Haw.Rev.Stat.* § 708–840 (1985) (containing in the course-of-committing-theft language); *Iowa Code Ann.* § 711.1 (West 1993) (requiring intent to commit a theft); *Ky.Rev.Stat.Ann.* § 515.030 (Michie/Bobbs–Merrill 1990) (linking theft and robbery by course-of-committing-theft language); *Me.Rev.Stat.Ann.* tit. 17–A, § 651 (West 1983) (associating robbery with theft by stating robbery must occur if theft committed or attempted); *Mont.Code Ann.* § 45–5–401 (1993) (using MPC course-of-committing-theft language); *N.H.Rev.Stat. Ann.* § 636:1 (Supp.1993) (same); *N.M.Stat.Ann.* § 30–16–2 (Michie 1984) (stating that robbery consists of theft by force or threats of force); *N.Y.Penal Law* § 160.00 (McKinney 1988) (declaring that robbery must occur in course of committing larceny); *N.D.Cent.Code* § 12.1–22–01 (1985) (including MPC in the course-of-committing-theft language); *Ohio Rev.Code Ann.* § 2911.02 (Anderson 1993) (listing theft section and MPC language); *Or. Rev.Stat.* § 164.395 (1990) (following MPC interpretation of robbery); *Pa.Cons.Stat.Ann.* tit. 18, § 3701 (1972) (same); *Tenn.Code Ann.* § 39–13–401 (1991) (defining robbery as intentional or. knowing theft of property); *Tex.Penal Code Ann.* § 29.02 (West 1989) (declaring robbery as offense occurring in course of committing theft); *Wyo.Stat.* § 6–2–401 (1988) (listing theft section and MPC language). Only a handful of states adopt the minority view that robbery is a crime of general intent. *See, e.g., State v. Minano,*

710 *P.*2d 1013, 1016 (Alaska 1985) (holding that intent to deprive is not indispensable element of robbery); *People v. Meeks*, 542 *P.*2d 397, 398 (Colo.Ct.App.1975) (declaring that robbery is general-intent, not specific-intent, crime); *State v. Thompson*, 221 *Kan.* 165, 558 *P.*2d 1079, 1086 (1976) (holding that intent to permanently deprive not element of robbery and that general intent will suffice for robbery conviction); *Traxler v. State*, 96 *Okla.Crim.* 231, 251 *P.*2d 815, 836 (1953) (ruling that intent to steal or deprive not element of robbery). Following the majority view, the Code specifies that robbery, like theft, is a specific-intent crime.

The Code, like the MPC, incorporates theft as an element of robbery. In this sense, all robberies are thefts, but not all thefts are robberies. *See State v. Sein*, 124 *N.J.* 209, 229, 590 *A.*2d 665 (1991) (Wilentz, C.J., dissenting) (stating that "[a]ll robberies are thefts; robbery is simply a greater offense that always includes theft"); *see also State v. Jordan*, 240 *N.J.Super.* 115, 120, 572 *A.*2d 676 (App.Div.) ("[T]heft of movable property and shoplifting are lesser-included offenses of second-degree robbery. . . ."), *certif. denied*, 122 *N.J.* 328, 585 *A.*2d 345 (1990); *State v. Lawson*, 217 *N.J.Super.* 47, 51, 524 *A.*2d 1278 (App.Div.1987) (theft merges into robbery); *Carlos*, *supra*, 187 *N.J.Super.* at 419, 455 *A.*2d 89 (Gaulkin, J., concurring) ("[S]ince robbery requires proof of theft or attempted theft, each such theft or attempted theft can yield only a single robbery conviction no matter how many persons are intimidated in connection therewith."); *cf. State v. Talley*, 94 *N.J.* 385, 393, 466 *A.*2d 78 (1983) (theft by deception, while not strictly lesser-included-offense of robbery, is nonetheless "embraced" within robbery). Consequently, the intent required for theft also is required for robbery. Although robbery may consist of an assault on one victim following a theft from another, *State v. Mirault*, 92 *N.J.* 492, 497 n. 4, 457 *A.*2d 455 (1983), theft or attempted theft is always a necessary element of any robbery, *Carlos*, *supra*, 187 *N.J.Super.* at 412, 455 *A.*2d 89.

The Code makes clear that for an act to constitute theft the stolen property must belong to another. An actor commits theft

"if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." *N.J.S.A.* 2C:20–3a; *see also N.J.S.A.* 2C:20–3b ("A person is guilty of theft if he unlawfully transfers any interest in immovable property of another with purpose to benefit himself or another not entitled thereto."); *N.J.S.A.* 2C:20–5 ("A person is guilty of theft by extortion if he purposely and unlawfully obtains property of another by extortion."). Implicit in the statute is the allocation to the State of the burden of proving that the property is that of another. "Property of another," under the statute, "includes property in which any person other than the actor has an interest which the actor is not privileged to infringe...." *N.J.S.A.* 2C:20–1h. Of course, a defendant has the right to present evidence tending to negate an essential element of the State's case. *See State v. Bowens,* 108 *N.J.* 622, 637, 532 *A.*2d 215 (1987) (explaining that evidence simultaneously can serve to support failure-of-proof defense and exculpatory defense). More specifically, a defendant charged with theft or robbery may present evidence proving that the property taken was the defendant's and not the "property of another." By comparison, claim of right is not premised on a failure of proof, but on justification. *See State v. Breakiron,* 108 *N.J.* 591, 603–04, 532 *A.*2d 199 (1987) (discussing various categories of defense: justification, excuse, failure of proof, or public policy).

-C-

Mejia contends that the trial court's anti-claim-of-right charge may have led the jury to believe that it could convict him of robbery even if it found that he had attempted to recover his own property. If the jury charge had that effect, however, the error was harmless. The jury could not have concluded rationally either that Mejia was attempting to recover his own specific property or that Garcia did not possess a protectible interest in it.

Here, moreover, Mejia was not attempting to recover specific currency, such as antique coins. Nothing suggests that Mejia

would have been dissatisfied with anything but the specific $750 that he had delivered to Garcia. As Mejia stated, he went to "collect the money [Garcia] owed me." In sum, Mejia attacked Garcia to collect a $750 debt.

-D-

Apart from arguing that he sought to recover his own specific property, defendant also relies on the affirmative defense of claim of right. To establish the claim-of-right defense, defendant need prove only that he honestly believed that he was recovering his own property, not that the alleged victim actually possessed his property. As the 1971 *Commentary to the Code* states, "[t]he Code adopts the position that a genuine belief in one's legal right shall in all cases be a defense to theft" when credible evidence supports the defense. II *New Jersey Code: The Final Report of the New Jersey Law Commission* § 2C:20–2, *Commentary* at 221–22 (1971); *cf. State v. Taplin*, 230 *N.J.Super.* 95, 100, 552 *A.*2d 1015 (1988) (recognizing defendant entitled to defense because he honestly but incorrectly believed he was assisting rightful owner in removing television set).

New Jersey has long recognized a claim-of-right defense. *See, e.g., State v. Mayberry*, 52 *N.J.* 413, 431, 245 *A.*2d 481 (1968), *cert. denied*, 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969). Before the enactment of the Code, however, in *State v. Ortiz*, 124 *N.J.Super.* 189, 305 *A.*2d 800 (1973), the Appellate Division refused to accept a claim-of-right defense to the charge of robbery, stating:

> In our view, the proposition [that a bona fide but mistakenly held belief that one has a right or claim to property negates the *mens rea* element of robbery] not only is lacking in sound reason and logic, but it is utterly incompatible with and has no place in an ordered and orderly society such as ours, which eschews self-help through violence. Adoption of the proposition would be but one step short of accepting lawless reprisal as an appropriate means of redressing grievances, real or fancied.
>
> [*Id.* at 192, 305 *A.*2d 800 (footnotes omitted).]

In the Code, the Legislature expressly established "claim of right" as an affirmative defense to theft:

It is an affirmative defense to prosecution for theft that the actor:

(1) Was unaware that the property or service was that of another;

(2) Acted under an honest claim of right to the property or service involved or that he had a right to acquire or dispose of it as he did; or

(3) Took property exposed for sale, intending to purchase and pay for it promptly, or reasonably believing that the owner, if present, would have consented.

[*N.J.S.A.* 2C:20-2c]

At issue is whether the Legislature implicitly intended the claim-of-right defense to apply to robbery.

In one pre-Code case, the Appellate Division held that the claim-of-right defense so applies. *See State v. D'Agostino,* 176 *N.J.Super.* 49, 53, 422 *A.*2d 97 (1980), *certif. denied,* 85 *N.J.* 494, 427 *A.*2d 583 (1981). The court reasoned that "[r]obbery ... is an aggravated form of larceny and when a person cannot be convicted of theft, then he cannot be convicted of robbery." *Id.* at 53, 422 *A.*2d 97. Thus, the court limited the defense to situations in which the defendant sought to reclaim his or her own property, not that of the victim, although equal in value, or repayment of a debt. *Id.* at 55–56, 422 *A.*2d 97.

Subsequently, the Law Division held that a defendant charged with robbery who claimed that he had loaned the victim twenty dollars could assert a claim-of-right defense only if the defendant sought to recover the identical currency that he had loaned. *State v. Bull,* 259 *N.J.Super.* 120, 122–23, 611 *A.*2d 672 (1992). Under these cases, to establish a claim-of-right defense, defendants charged with robbery must prove that they sought to recover the specific property delivered to the victim.

We disagree with *D'Agostino* and *Bull.* Consequently, we overrule them to the extent that they hold that claim-of-right is a defense to robbery. Those decisions hinge on the following syllogism. Robbery equals theft plus assault. Claim of right is a defense to theft. Therefore, it is a defense to robbery.

Robbery, however, is a more complex crime than theft plus assault. As we recently noted, "the shorthand understanding that robbery equals theft plus assault is inconsistent with the clear, albeit complicated, language of the Code." *State v. Sewell,* 127

*N.J.* 133, 147, 603 *A.*2d 21 (1992). Our reading of the Code leads us to conclude that the Legislature did not intend to treat robbery simply as the combination of theft plus the use of unprivileged force.

Indeed, the Code's structure indicates that the Legislature intended that not all defenses to theft should apply to robbery. The Legislature, when it enacted the Code in 1979, placed the crime of robbery in the section entitled "Offenses Involving Danger to the Person," and that of theft in "Offenses Against Property." As one commentator states:

[T]he arrangement of sections within the Code is not haphazard. There is a conscientious attempt to organize sections and chapters by subject. Thus, as part of L.1979, c. 178, [r]obbery was removed from Chapter 19, where it was grouped with offenses against property, to Chapter 15, so that it would be grouped with offenses against persons.

[Cannel, *supra,* at 5.]

Other provisions of the Code suggest that the Legislature intended to preclude recourse to the claim-of-right defense for thefts accompanied by violence. For example, the theft-by-extortion statute contains its own claim-of-right provision, which provides that "[i]t is an affirmative defense to prosecution ... that the property obtained was honestly claimed as restitution or indemnification for harm done in the circumstances or as lawful compensation for property or services." *N.J.S.A.* 2C:20-5. The statute, however, limits the defense to extortion committed by the threat of accusation, exposure, withholding official action, or withholding testimony. It does not extend to threats to "[i]nflict bodily injury on or physically confine or restrain anyone or commit any other criminal offense." *N.J.S.A.* 2C:20-5g. This limitation evinces a legislative intent to withhold a claim-of-right defense from those who threaten others with physical harm.

Furthermore, the emerging trend in other jurisdictions rejects the claim-of-right defense to robbery. *People v. Reid,* 69 *N.Y.*2d 469, 515 *N.Y.S.*2d 750, 752, 508 *N.E.*2d 661, 664 (1987); *see also, e.g., State v. Schaefer,* 163 *Ariz.* 626, 790 *P.*2d 281, 284 (1990) (rejecting claim-of-right defense because "[i]t encourages dispu-

tants to resolve disputes on the streets through violence instead of through the judicial system."); *Commonwealth v. Sleighter*, 495 *Pa.* 262, 433 *A.*2d 469, 471 (1981) (asserting that person with adequate remedy at law should not try to recover property by force or violence); *Austin v. State*, 86 *Wis.*2d 213, 271 *N.W.*2d 668, 670 (1978) (holding that defendant's belief he was recovering his own money did not bar conviction for armed robbery), *overruled on other grounds, State v. Poellinger*, 153 *Wis.*2d 493, 451 *N.W.*2d 752, 757 (1990).

From the words and structure of the Code, and for sound reasons of public policy, we conclude that the Legislature did not intend to extend the claim-of-right defense to robbery. We hold that Mejia was not entitled to a claim-of-right charge on the guilt phase. Accordingly we affirm his robbery and felony-murder convictions.

-E-

By comparison, we hold that the penalty-phase anti-claim-of-right charge precluded the jury from considering as a mitigating factor Mejia's honest belief that he was entitled to recover his $750 from Garcia. If on remand the case should proceed to the penalty phase, we offer the following further comments to guide the trial court. The evidence that Mejia was seeking to recover his own money relates both to the mitigating and aggravating factors. For example, the evidence relates to the "catch-all" factor, *N.J.S.A.* 2C:11:3c(5)(h), pertaining to "any other factor which is relevant to his character or background or to the circumstances of the offense." If the jury believed that Mejia acted to prevent Garcia from fleeing to Mexico with Mejia's money, it could have weighed the mitigating evidence more heavily than if it believed that he went to the hotel to rob Garcia. Similarly, if one or more jurors believed that Mejia acted under a claim of right, that belief could have reduced the weight the jury placed on the c(4)(g) factor, "murder committed during a felony." If on remand, the case should proceed to the penalty phase, the court should

instruct the jury on the relevance of the evidence both to the aggravating and mitigating factors.

-IV-

██ Relying on the Fifth and Fourteenth Amendments to the United States Constitution and article I of the New Jersey Constitution, Mejia challenges the admission into evidence of his written statement. He contends that the trial court erred in concluding that he had knowingly and intelligently waived his "*Miranda*" rights, *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), before making the statement. We reject that claim and sustain the admission of his statement.

When Mejia was arrested on December 10, 1991, Belmar patrolman John Massey asked him if he understood English. Mejia replied, "very little." After Officer Massey read Mejia his *Miranda* rights, Mejia indicated that he did not understand. By putting his forefinger to his mouth, the officer signalled that Mejia should remain silent.

Sergeant Jose Raymond Ortiz of the Bradley Beach Police Department responded to a call from the Belmar Police Department for assistance. Sergeant Ortiz was born in Puerto Rico and raised in a Spanish-speaking home. He had not, however, had any formal education in Spanish. Officer Ortiz read Mejia his rights from a Spanish language *Miranda* card.

According to Ortiz, Mejia understood his rights as Ortiz read them to him. In response to questions asked by Officer Ortiz, Mejia stated his name, address, and date of birth. He then signed the card.

At the Spring Lakes Police Department, Investigator Joseph Paglino from the Monmouth County Prosecutor's Office interviewed Mejia. Investigator Paglino had studied Spanish in high school and had acted as a translator for the prosecutor's office.

Paglino read to Mejia his rights from a bilingual *Miranda* card provided by the Spring Lakes Police Department. The Spanish

translation of the *Miranda* rights on the Spring Lakes card differed from that on the Belmar card. As Paglino read each line, he paused and asked Mejia whether he understood. Each time, Mejia answered "Si," indicating that he understood. After reading the entire card, Paglino again inquired whether Mejia understood each right read to him, and asked, "[k]eeping these rights in mind, do you want to speak to us now?" Mejia answered "Si" to both questions.

Paglino then asked Mejia to read the *Miranda* card and to sign a photocopy of the card if he understood and voluntarily waived his rights. Mejia signed the card.

Mejia then gave an oral statement, which was transcribed by a bilingual secretary, in a nine-page transcript beginning with the *Miranda* warnings. Paglino again read to Mejia his *Miranda* rights. Using the name "Martin Gamez" and the initials "M.G.," Mejia made and initialled several corrections in the statement. He then signed the statement. At no time did Mejia indicate that he did not understand the *Miranda* rights or the statement. As previously indicated, *supra* at 479–80, 662 *A*.2d at 310, Mejia's statement described the purpose of his trip to the Breakers Hotel and the facts surrounding the shooting.

At the suppression hearing, the trial court concluded that Officer Ortiz had not effectively explained defendant's *Miranda* rights. The court found, however, that Mejia had not been harmed because he did not give a statement until after Investigator Paglino, whom the court described as "clearly a qualified interpreter," again administered the *Miranda* warnings.

The court noted, however, "some confusion" about warning number four on the *Miranda* card, which stated: "Si Ud. no puede alquilar a un abogado, se nombrara uno para representarlo antes di que lo interroguen so lo desea Ud."

The purpose of the warning was to inform Mejia that if he could not afford a lawyer, one would be appointed for him. According to a court translator, strictly translated, the warning reads: "You

have the right to rent or hire an attorney. And you have the right to request one before being interrogated."

As the trial court noted, the warning could have more clearly apprised defendant of his right to a court-appointed lawyer free of cost. Part of the problem is with the verb "alquilar," which means "to let, hire, rent." Anthony Gooch and Angel Garcia de Paredes, *Cassell's Spanish–English, English–Spanish Dictionary* 42 (1978). Although the warning card might have used a better verb, we cannot say that the card misled Mejia. Some clients speak of "retaining" lawyers, while others may talk of "hiring" them.

Another problem is that the *Miranda* warning did not expressly advise Mejia that if he could not afford an attorney, the court would appoint one for him. Here, Officer Ortiz supplemented the warnings on the Belmar *Miranda* card by informing Mejia "that the Court would appoint an attorney if you can not afford one.... I explained to him that the court would appoint one if he could not afford an attorney." The record is devoid, moreover, of any suggestion that Mejia was confused or did not fully appreciate his rights. Under these circumstances, we find that Mejia knowingly and intelligently waived his *Miranda* rights.

Mejia does not claim that the police coerced, intimidated, or tricked him into giving the statement. Our reading of the record persuades us that the police, confronted with the practical problem of advising a Spanish-speaking suspect, adequately administered the *Miranda* warnings.

The problem of communicating *Miranda* rights to non-English-speaking defendants is important, particularly in a state with so diverse a population. To assist local law-enforcement officers in meeting their constitutional obligation, the Attorney General should develop appropriate bilingual *Miranda* warnings. In making that recommendation, we recognize that law-enforcement officials cannot print *Miranda* warnings for all linguistic minorities. But that should not prevent the State from preparing cards for the larger segments of the non-English speaking population.

-V-

Defendant contends that the trial court's failure to charge passion/provocation manslaughter constitutes plain error. The record, however, does not provide a rational basis for such a charge. Although a confrontation occurred, defendant, who was armed with a loaded gun and accompanied by a knife-wielding accomplice, was the aggressor. The victim was unarmed. The record does not provide a rational basis to find either that the victim had provoked defendant or that defendant had killed in a state of passion. *See State v. Mauricio*, 117 *N.J.* 402, 411, 568 *A.*2d 879 (1990) (stating that elements of passion/provocation manslaughter include adequate provocation and objective passion).

Defendant also argues that the trial court abused its discretion in imposing a twenty-year sentence for robbery consecutive to his sentence for murder. He contends that the robbery and murder so intertwined that the court should not have imposed consecutive sentences. We reject his contention.

Mejia and his accomplice chased Garcia from room to room, brandishing a gun, and demanding the return of Mejia's $750. Once he cornered Garcia, Mejia struck him with his gun, thereby fracturing Garcia's skull. These actions alone constitute armed robbery. Mejia then chased Garcia down a hallway and killed him, thereby committing murder. Although the victim in both offenses was the same, the crimes were separate. Under these circumstances, the trial court did not abuse its discretion in imposing consecutive sentences.

Indeed, we have emphasized that "there can be no free crimes," *State v. Yarbough*, 100 *N.J.* 627, 643, 498 *A.*2d 1239 (1985), *cert. denied*, 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), and that "separate crimes deserve separate punishment," *State v. Sutton*, 132 *N.J.* 471, 485, 625 *A.*2d 1132 (1993). The trial court properly considered all the circumstances and made "an overall evaluation of the punishment for the several offenses involved." *Yarbough, supra,* 100 *N.J.* at 646, 498 *A.*2d 1239.

-VI-

We briefly address Mejia's other arguments, all of which our disposition has rendered moot. The arguments include Mejia's challenge to the court's refusal to question prospective jurors about their familiarity with the trial after *Biegenwald IV*, which had ended in Monmouth County two weeks earlier. Similarly moot is defendant's argument that the trial court committed reversible error in permitting defendant to absent himself from the penalty-phase proceedings. On remand, defendant may attend both the guilt- and penalty-phase proceedings.

We also find moot the alleged prejudice from the prosecutor's comments on summation, after referring to the various parts of the State's summation, that there "was not evidence to the contrary." Defendant claims these references constituted an improper comment on defendant's right not to testify. We remit to the sound discretion of the trial court the proper control of any such remarks if the State should repeat them in any retrial.

Also moot is Mejia's challenge to the admission at the penalty trial of rebuttal psychological testimony and of a letter from defendant to his father. At the penalty-phase hearing, defendant sought to emphasize the abuse he had suffered as a child. Of defendant's eight mitigating factors, six related to that child abuse. To establish these factors, Mejia relied on the testimony of a forensic social worker and a clinical psychologist. In rebuttal, the State called two psychologists. Mejia claims that the testimony of the State's experts went beyond rebutting his proof of the mitigating factors and sought to prove aggravating factors not asserted by the State.

On remand, if the State pursues the case to the penalty phase, it should limit its proof to the rebuttal of defendant's mitigating factors. The State may prove asserted aggravating factors and rebut mitigating factors, *State v. Rose*, 112 *N.J.* 454, 503, 548 *A.*2d 1058 (1988), but may not introduce "a new aggravating factor under the guise of producing rebuttal evidence," *State v. Biegenwald II*, 110 *N.J.* 521, 543, 542 *A.*2d 442 (1988).

The murder conviction is affirmed, but the imposition of the death penalty is reversed. The convictions for felony murder, armed robbery, aggravated assault, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon are affirmed. With the exception of the sentence on armed robbery, all non-capital sentences are affirmed. Although not briefed or argued by the parties, a question exists concerning the sentence for armed robbery. According to the transcript of the sentencing hearing, the trial court sentenced defendant to a consecutive term of twenty years without parole. In their briefs, defendant and the Attorney General describe the sentence without reference to the parole disqualifier, but the Monmouth County Prosecutor describes it as "a twenty-year sentence with no parole...." Consistent with *N.J.S.A.* 2C:43-6, the trial court should clarify the specific term and the period of parole ineligibility on the armed-robbery conviction.

If the State elects to retry defendant for capital murder, all convictions, including the sentences, will be vacated. The matter is remanded to the Law Division for further proceedings.

HANDLER, J., concurring.

In this capital murder case, defendant Rigoberto Mejia was charged with murder, felony murder, armed robbery, aggravated assault, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. The Prosecutor served notice that it would seek the death penalty. The guilt phase of the trial commenced approximately one year later. Mejia was found guilty of murder and, following a penalty trial, was sentenced to death.

The Court now reverses defendant's conviction and death sentence. I concur, and write separately to identify and explain additional grounds that, in my opinion, warrant those reversals.

I

Two weeks prior to the beginning of jury selection in this case, another Monmouth County capital-murder prosecution involving

the notorious multiple killer, Richard Biegenwald, was concluded. As murder cases go, Biegenwald's was particularly dramatic. He stalked and killed young women for no apparent reason. The press dubbed him a "thrill killer." The jury, however, declined to impose the death penalty on Biegenwald, and he therefore received a life sentence. The highly publicized news reports and commentary prompted by his "escape" from the death penalty cast doubt on the viability of the death penalty in New Jersey. Press articles abounded, decrying the result and castigating the criminal justice system for its failure to give Biegenwald the sentence that most people felt he deserved.

In light of the intense publicity, defense counsel for Mejia moved for a change of venue. He cited the fact that the local newspaper, the *Asbury Park Press,* carried daily reports on the trial from March 5, 1993 to March 16, 1993. One front-page story was accompanied by a photo of Biegenwald "celebrating" his life verdict with his lawyers. In its Sunday edition of March 21, 1993, the *Asbury Park Press* ran a story entitled, "Prosecutors Regroup on Death Penalty." Inside the story, the Monmouth County Prosecutor was quoted saying, "Biegenwald is the icing on the cake for the defeat essentially of the death penalty." In the story, the prosecutor promised that his office would re-evaluate whether or not to pursue the death penalty against Rigoberto Mejia. A companion piece to that story was entitled, "Victims' Kin Cry for Justice." The article contained interviews with family and friends of Biegenwald's victims all expressing outrage at the life verdict he received. Press coverage of the Biegenwald verdict was a major, front-page pre-occupation of the local newspaper for nearly three weeks.

The trial court refused to grant defendant's request for a change of venue, but allowed defense counsel to question potential jurors about their knowledge of and feelings towards recent Monmouth County capital cases. Of the forty potential jurors then questioned by the trial court, two indicated some familiarity with the Biegenwald case. One of those eventually was excused

for cause, and the other was peremptorily challenged by defendant.

During the course of *voir dire*, on April 15, 1993, nearly one month after the Biegenwald verdict, the judge presiding over the trial was replaced. The second judge quickly indicated that he would not allow particularized questioning about a number of issues, including whether a juror had any opinion about recent Monmouth County capital cases. The judge explained that such open-ended questioning was only appropriate if it was directly related to the defendant's case. Despite the fact that defense counsel was prohibited from asking about the Biegenwald verdict directly, reference to it recurred. Several of the potential jurors questioned under the court's new regime did volunteer opinions about the Biegenwald case. One juror, K.F., who claimed an opinion on the Biegenwald case did sit on defendant's jury. (Three other jurors who expressed opinions about Biegenwald were excused for cause, but not for cause arising out of their opinions on Biegenwald.)

Defendant contends that, given the intense publicity surrounding the Biegenwald case, the court deprived him of his right to an impartial jury by refusing to allow the questioning of all potential jurors about their views on that case. The court's ruling allowed only for revelation of the views of those jurors who volunteered an opinion on the Biegenwald case, depriving defendant of his opportunity to discover bias among possible jurors who might not otherwise disclose, for whatever reason, their exposure to the Biegenwald case. Defendant's argument must be considered in the context of a capital defendant's right to be tried by a jury that is both fair and impartial and duly qualified, and the central role of the *voir dire* in ensuring the selection of such a jury.

The importance of a defendant's right to trial by an impartial jury, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Art. 1, par. 10 of the New Jersey Constitution, cannot be overstated. This right is of exceptional significance "in cases in which the defendant faces death." *State*

*v. Williams,* 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983) (*Williams* I). In capital cases, where a human life is at stake, it is particularly important for the trial court "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudication process." *Id.* at 63, 459 *A.*2d 641; *Beck v. Alabama,* 447 *U.S.* 625, 637–38, 100 *S.Ct.* 2382, 2389–90, 65 *L.Ed.*2d 392, 403 (1980); *State v. Marshall,* 123 *N.J.* 1, 216, 586 *A.*2d 85 (1991) (Handler, J. dissenting) ("[I]n a capital-murder prosecution, the jury must be specially qualified in order to assure that high degree of objectivity, sensitivity, fairness, and impartiality essential to determine criminal guilt and appropriate sentence.") (citing *Ross v. Oklahoma,* 487 *U.S.* 81, 108 *S.Ct.* 2273, 101 *L.Ed.*2d 80 (1988); *State v. Bey,* 112 *N.J.* 123, 151–54, 548 *A.*2d 887 (1988) (*Bey* II); *State v. Ramseur,* 106 *N.J.* 123, 248–54, 524 *A.*2d 188 (1987); *Williams I, supra,* 93 *N.J.* at 61–63, 459 *A.*2d 641); *State v. Koedatich,* 112 *N.J.* 225, 268, 548 *A.*2d 939 (1988) (citation omitted); *State v. Biegenwald,* 106 *N.J.* 13, 92, 524 *A.*2d 130 (1987) (*Biegenwald I* ) (Handler, J., dissenting); *State v. Jackson,* 43 *N.J.* 148, 156, 203 *A.*2d 1 (1964); *State v. Mount,* 30 *N.J.* 195, 213, 152 *A.*2d 343 (1959); *State v. Wynn,* 21 *N.J.* 264, 271, 121 *A.*2d 534 (1956). Thus, this Court has recognized that there is a heightened standard to be applied in ensuring that a capital defendant's right to trial by an impartial jury is respected. *State v. Biegenwald,* 126 *N.J.* 1, 30, 594 *A.*2d 172 (1991) (*Biegenwald IV* ) (citing *Ramseur, supra,* 106 *N.J.* at 324 n. 84, 524 *A.*2d 188).

Likewise, the importance of *voir dire* in ensuring jury impartiality and competence is obvious; only an adequate pre-trial examination of potential jurors can result in proper qualification. Inadequate *voir dire* undermines both the parties' and the Court's ability to secure a competent and impartial jury. *See State v. Williams,* 113 *N.J.* 393, 445, 550 *A.*2d 1172 (1988) (*Williams II* ) (noting that inadequate *voir dire* denies parties necessary information relevant to intelligent exercise of peremptory challenges or to challenge for cause; likewise leaves court unable to assess juror fitness). We have in many cases suggested the ways in which to undertake an adequate *voir dire. State v. Moore,* 122 *N.J.* 420,

449–50, 585 A.2d 864 (1991); *Williams I, supra,* 93 N.J. at 68–69, 459 A.2d 641. "An adequate *voir dire* should incorporate [those suggestions] with an eye toward providing counsel and the court with the tools necessary to perform their respective tasks comprehensively and intelligently." *Biegenwald IV, supra,* 126 N.J. at 34, 594 A.2d 172. The harm of an inadequate *voir dire* is that it makes it difficult for parties and the court to make informed choices in the empaneling of jurors. Peremptory challenges cannot rectify that inadequacy and the fact that a party has failed to exhaust all peremptory challenges is of no consequence. *Id.* at 30, 594 A.2d 172.

Trial judges are entrusted with considerable discretion and flexibility in conducting *voir dire. Williams II, supra,* 113 N.J. at 410, 550 A.2d 1172. However, that discretion must ensure that *voir dire* is an effective tool in protecting a defendant's right to an impartial jury. *Williams I, supra,* 93 N.J. at 71 n. 18, 459 A.2d 641. Thus, this Court has reversed convictions where the trial judge failed to allow inquiry into certain areas on *voir dire. See Williams II, supra* (reversing conviction, in part, because trial judge failed to question jurors about their ability to be fair in light of brutal rape/murder); *Biegenwald IV, supra* (ordering new sentencing hearing because jury was not questioned about the effect of defendant's prior murder convictions); *Moore, supra* (reversing conviction on other grounds, but instructing judge to allow open-ended questioning regarding status of victims); *cf. State v. Martini,* 131 N.J. 176, 619 A.2d 1208 (1993) (holding failure to question on effect of kidnapping aggravating factor harmless where no questions were requested and over-all process was thorough and probing).

Fundamentally, a proper *voir dire* must be sufficiently broad to expose potential bias and to assure that each juror can comply with the governing legal standards. *Biegenwald IV, supra,* 126 N.J. at 65, 594 A.2d 172 (Garibaldi, J., dissenting) (citing *State v. Perry,* 124 N.J. 128, 155, 590 A.2d 624 (1991)); *State v. Hunt,* 115 N.J. 330, 354, 558 A.2d 1259 (1989). In a capital case, *voir dire*

performs two important functions: (1) its traditional role of assuring juror impartiality; and (2) its special role of serving to "death-qualify" potential jurors. As we stated in *Moore, supra,* "Under our single-jury capital-trial system, jury selection must ... serve double duty as both a time to 'death qualify' jurors and a time to enable counsel to ... select a fair and impartial jury. The purposes of the inquiry are simply not the same, although they tend to overlap." 122 *N.J.* at 449, 585 *A.*2d 864.

The distinctive nature of *voir dire* in capital causes has been underscored. *See State v. Dixon,* 125 *N.J.* 223, 244, 593 *A.*2d 266 (1991); *Moore, supra,* 122 *N.J.* at 447, 585 *A.*2d 864. "The creation of an impartial jury, through the process of *voir dire,* follows 'no particular tests' and is 'not chained to any ancient and artificial formulas.'" *Biegenwald IV, supra,* 126 *N.J.* at 66, 594 *A.*2d 172 (Garibaldi, J., dissenting) (quoting *United States v. Wood,* 299 *U.S.* 123, 145–46, 57 *S.Ct.* 177, 185, 81 *L.Ed.* 78, 88 (1936)). The adequacy of *voir dire* is measured by the quality of information it yields to enable the court and counsel to exercise their respective functions, including challenges, both for cause and peremptory. *See Biegenwald IV, supra,* 126 *N.J.* at 32, 594 *A.*2d 172 (noting that by limiting *voir dire* the court "denied counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role"); *Moore, supra,* 122 *N.J.* at 446, 585 *A.*2d 864 ("*voir dire* acts as a discovery tool"). This Court has stressed the need for trial judges to take a wider view of the permissible scope of *voir dire* in a death penalty case. *Moore, supra,* 122 *N.J.* at 451, 585 *A.*2d 864. Moreover, trial courts have been admonished not to insist blindly that the proposed line of inquiry be assessed solely in terms of the likelihood that it would result in an excusal for cause. *Ibid.*

Pre-trial publicity poses a special threat to the impanelling of a jury that is both properly qualified and fair and impartial. Information received through the press has the power to significantly alter one's impressions and to arouse biases, and often its effects are subliminal. The *voir dire* is the chief mechanism to extirpate

and combat the prejudicial residue of pretrial publicity. *Williams I, supra*, 93 *N.J.* at 68, 459 *A.*2d 641; *Williams II, supra*, 113 *N.J.* at 429, 550 *A.*2d 1172. Jurors who have formed an opinion as to guilt or innocence must be excused, and "[o]nly if it is demonstrated that 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court' will extraneous exposure to the facts of the case not be grounds for automatic disqualification." *Williams I, supra*, 93 *N.J.* at 61, 459 *A.*2d 641 (quoting *State v. Sugar*, 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980) and *Dobbert v. Florida*, 432 *U.S.* 282, 97 *S.Ct.* 2290, 53 *L.Ed.*2d 344 (1977)).

Courts have considerable flexibility in coping with the prejudicial effects of adverse publicity. However, in cases preceded by extensive publicity, an "exhaustive and searching *voir dire*" is the linchpin necessary to empaneling impartial jurors, particularly where pre-trial motions to change venue and sequester the jury have been denied. *Williams I, supra*, 93 *N.J.* at 68–69, 459 *A.*2d 641; *see also Biegenwald I, supra*, 106 *N.J.* at 29, 524 *A.*2d 130, (underscoring indispensability of the "searching *voir dire* interrogation" to obtaining an impartial jury); *Marshall, supra*, 123 *N.J.* at 220–21, 586 *A.*2d 85 (Handler, J., dissenting) ("extraordinary importance attaches to the *voir dire* and death qualification process").

> [An] important, indeed critical, means for dealing with potential and latent bias is the voir dire. The court should consider the efficacy of more exhaustive and searching voir dire examinations.... The [trial] court could consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause. Particularly in capital cases, the trial judge should exercise extraordinary care in the voir dire of potential jurors and could excuse for cause any juror who has been exposed to sensational prejudicial publicity, especially where such exposure is repeated and involves patently inadmissible evidence.
>
> [*Williams* I, *supra*, 93 at 68–69 (footnote omitted).]

We have recognized the need for the independent and scrupulous evaluation of the *voir dire* by a reviewing court to resolve the claims raised by adverse pretrial publicity. *See Biegenwald I, supra*, 106 *N.J.* at 87, 524 *A.*2d 130 (citing *State v. Van Duyne*, 43 *N.J.* 369, 386, 204 *A.*2d 841 (1964)). This Court encourages an

intensified review of the adequacy of *voir dire* that stresses the need for particularized questioning of potential jurors. *See Williams II, supra,* 113 *N.J.* at 414, 550 *A.*2d 1172; *Moore, supra,* 122 *N.J.* at 447, 585 *A.*2d 864 (condemning trial court's refusal to allow defense counsel to ask questions regarding the victim's status as a child.)

In *Biegenwald I, supra,* we recognized that the reviewing court must examine the extent to which potential jurors are biased as a result of any publicity surrounding the case. In determining whether a realistic likelihood of prejudice exists in a particular case, a court must first distinguish "between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel." 106 *N.J.* at 33, 524 *A.*2d 130 (citations omitted).

In determining whether a presumption of prejudice exists in a given case, we must first examine certain factors that measure the potentially-prejudicial effect of pretrial publicity. *Koedatich, supra,* 112 *N.J.* at 271, 548 *A.*2d 939. Those factors include, but are not limited to: (1) evidence of extreme community hostility against defendant; (2) prominence of either the victim or the defendant within the community; (3) the nature and extent of news coverage; (4) the size of the community; (5) the nature and gravity of the offense; and (6) the temporal proximity of the news coverage to the trial. *Id.* at 271–73, 548 *A.*2d 939.

In *Biegenwald IV, supra,* we observed that where prejudice is not presumed, the appropriate inquiry to determine if the record indicates a "realistic likelihood of prejudice" is whether under the totality of the circumstances the *voir dire* and the handling of the jurors resulted in a fair and impartial jury. 126 *N.J.* at 22–23, 594 *A.*2d 172. In *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I* ), we reversed the defendant's murder conviction because the trial court failed to ensure that the jury was not exposed to mid-trial publicity respecting defendant's other-alleged offenses, in-

cluding another murder. The Court held that the test for such publicity was, "[i]f the court is satisfied that the published information has the capacity to prejudice defendant, it should determine if there is a realistic possibility that such information may have reached one or more of the jurors." *Id.* at 86, 548 *A.*2d 846 (citation omitted). If there is such a realistic possibility, a *voir dire* must be conducted to ascertain whether any juror has been exposed. *Id.* at 86–87, 548 *A.*2d 846. The Court then must determine whether the mid-trial publicity had a "[great] capacity to prejudice a defendant's case," *id.* at 90, 548 *A.*2d 846, and where the publicity had such a strong potential for prejudice, the usual assumptions about jurors following their oaths and adhering to the judge's instructions are not warranted. *Id.* at 81–83, 548 *A.*2d 846.

The required critical standard in determining whether defendant's right to an impartial jury has been impaired inheres in our inquiry into "whether under the totality of the circumstances the *voir dire* and the trial court's handling of the jurors resulted in a fair and impartial jury." *Biegenwald IV, supra,* 126 *N.J.* at 23, 594 *A.*2d 172. The Court's task in this case is to assess the overall adequacy of the *voir dire* in light of the trial court's refusal to allow questions of potential jurors about their exposure to pre-trial publicity concerning "recent Monmouth County capital cases."

Biegenwald was a particularly notorious defendant. This Court itself observed that the Biegenwald case had received "extensive pre-trial publicity," noting that the local press had nicknamed him the "thrill killer." *Biegenwald II,* 106 *N.J.* at 21, 524 *A.*2d 130. Biegenwald's murders were particularly dramatic and the press coverage exceeded the norm for a murder case. Biegenwald's was the first case in Monmouth County in which the Prosecutor sought the death penalty. Moreover, the community in which the murders occurred is somewhat small and isolated, especially during the winter season. The *Asbury Park Press* covered the trial on a daily basis, culminating in Biegenwald's life verdict, which was handed down just two weeks before jury selection began in defendant's case.

The pretrial publicity involving the Biegenwald case clearly infiltrated the circumstances surrounding defendant's case. After the verdict, public outrage fueled official speculation regarding the future viability of the death penalty. Thus, some of the press coverage focused on the systemic implications of Biegenwald's life sentence. The local prosecutor suggested that he would have to reconsider whether it was worthwhile to seek the death penalty in defendant's case.

A fair argument can be made that this type of coverage would tend to suggest to jurors that they could "send a message" and aid in ensuring that capital punishment remained viable by imposing a death sentence on defendant. That possibility is neither remote nor speculative as is evidenced by this Court's acknowledgement of the public's "impatience" with capital-murder jurisprudence in this state. *State v. Long*, 119 *N.J.* 439, 465, 575 *A.*2d 435 (1990). The Biegenwald verdict, coupled with the prosecutor's publicized skepticism, could easily produce a sense in the community that the death penalty needed some use in order to survive. *See, e.g.*, Jim O'Neil, *Sholler Family Enraged as Split Spares Johnson*, *Star Ledger*, March 5, 1995, at 1, 22 (reporting public shock and anger over failure of jury in the Gail Sholler killing to impose death sentence on the defendant); Mathew Reilly, *Decision to Spare Murderer's Life Doesn't Surprise Public Defender*, *Star Ledger*, March 5, 1995, at 23 (generally the same). Had the trial court allowed relevant specific questions, the parties would have obtained useful information about the attitudes of potential jurors bearing on their fitness to serve as jurors in a death-penalty trial. Although only a few of the jurors mentioned the case, the record leaves the strong impression that there was a general awareness of that case, an awareness that produced strong reactions in the jurors who mentioned it. Although it is impossible to gauge the content of a juror's memory, it is within our common experience that when asked a direct question we recall information—impressions, memories, and even opinions—which might not be prompted by more open-ended questioning. There can be little doubt that the trial court's ruling significantly reduced defense counsel's

capacity to jog a juror's memory and elicit whatever reactions that lurked there.

The Court should also consider the broader purpose that would be served by asking questions about the Biegenwald verdict on *voir dire*. Even if no conscientious juror would allow their outrage over Biegenwald's "escape" to cloud his or her consideration of defendant's case, questioning about the Biegenwald verdict would nonetheless provide the court and the parties with significant insight into a juror's attitude toward capital punishment in general. Recalling that *voir dire* in a capital case is as much about death qualification as it is about impartiality (and that the two inquiries are not the same), the use of the Biegenwald verdict in *voir dire* would have been productive. Certainly defense counsel and the original presiding trial judge believed it to be.

The fact that defendant received a death sentence is evidence that this Court should not treat the insufficient *voir dire* so dismissively. The imposition of a death sentence on defendant is itself both surprising and suspect. An examination of the data relevant to the proportionality of defendant's death sentence indicates for defendant a very low criminal culpability as compared to other capital defendants. *See* David C. Baldus, *Death Penalty Proportionality Review Project: Final Report to the New Jersey Supreme Court*, 92–100 (Sept. 24, 1991) (hereinafter *Final Report* ). A consideration of both the statutory and non-statutory aggravating and mitigating circumstances present in defendant's case puts him in the grouping of defendants least likely to receive the death sentence. *See id.* at 95; *State v. DiFrisco*, appeal pending (DiFrisco Report). In fact, the most recent index-of-outcomes figures indicate that out of a universe of all penalty-trial cases up to date, defendant has the lowest probability of receiving a death sentence out of the 38 individuals sentenced to death since the reinstitution of the death penalty. *See, e.g.*, DiFrisco Report. Clearly defendant's death sentence is disproportionate to his crime. *Final Report, supra,* at 92–100.

Although the Court, as a practical matter, is not called on to engage in a proportionality review of defendant's death sentence, it should not resist the critical examination required of information that is indicative of obvious disproportionality and therefore highly relevant to the issue of whether prejudicial factors influenced the result reached in defendant's case. Frankly, I see no other way to rationalize this clearly disproportionate sentence than to reason that the jury was significantly influenced by the taint of the pre-trial publicity surrounding defendant's trial.

## II

At the penalty trial, defendant's principle mitigation strategy was to highlight the extreme abuse he suffered as a child. Of the eight specific mitigating factors submitted by the defense, six related to the alleged physical and psychological trauma defendant suffered. To establish those factors, defendant relied on the testimony of a forensic social worker and a clinical psychologist with expertise in family violence and its effects on a child's development, Dr. Marsha Kleinman.

Defendant offered Dr. Kleinman's testimony to establish that he had in fact suffered severe abuse. The testimony did not, in his view, propose to diagnose any particular mental illness that was, inferentially, a medical or legal cause of the murder. However, on cross-examination, to the surprise of the defense, Dr. Kleinman testified that she thought that defendant suffered from post-traumatic stress disorder. Defense counsel objected to that line of questioning as exceeding the scope of the direct examination.

In rebuttal, Drs. Michals and Coram testified that defendant did not suffer from that disorder, and that whatever antisocial traits defendant possessed would not prevent him from "operating within a structured society...." Dr. Coram went so far as to label defendant "sociopathic," and to declare that it was impossible to isolate the effect of one factor, such as child abuse, in identifying a cause of subsequent behavior.

Defendant argues that the State's rebuttal evidence had the effect of distorting the meaning of the proffered mitigating evidence, and as a result of that distortion, allowed the State to introduce additional non-statutory aggravating factors, namely, "a lack of mental illness" and "further dangerousness." Additionally, defendant argues that the State shifted the focus by offering its evidence to rebut defendant's childhood abuse as an excuse for his behavior, which misled the jury because defendant did not proffer the evidence of his abusive childhood to excuse his conduct, but rather to suggest that he did not deserve to be put to death.

Defendant contends that the trial court erred in failing to heed the defense objections to the State's line of rebuttal evidence, and that even if the State's evidence was admissible, a limiting instruction was required to avoid juror confusion and prejudice. The Court rejects defendant's arguments as moot. *Ante* at 501–02, 662 *A.*2d at 321. I, however, believe they warrant reversal of his death sentence.

The trial court, in overruling defense counsel's objections to the State's rebuttal witnesses' testimony and in denying defendant's motion to strike the rebuttal evidence, found that the rebuttal evidence did not dispute the existence of child abuse but was nonetheless proper because it disputed the value placed on the evidence by the defense expert. To determine what "value" defendant's expert placed on her own evidence, the Court must first examine what Dr. Kleinman said.

Dr. Kleinman stated:

Well based on everything that I have read, my experience with—my interviews with Mr. Mejia, which occurred before I reviewed the other documentation, it's my opinion that he was abused as a child, that he suffered both physical, severe physical abuse, he suffered serious and severe psychological abuse, he suffered early emotional deprivation, really abandonment from his father and later from his mother and then later from his father, that he really never had a chance to develop and grow and become a healthy adult in this environment.

He never had a shot at learning the skills and the emotional development and developing the emotional wherewithal to function in a society at large, that he really—this was destroyed in him, that every baby that comes into this world has lots of different potential, all have different potential, but you take that child and

you raise it one way or you raise it another and in this case I believe that he learned violence, he did not learn coping skills, didn't learn how to deal with this.

He was also raised with tremendous anger. If you are deprived emotionally and physically you grow feeling angry, you grow feeling angry and you can't tolerate it, you don't have the ability to tolerate slight infractions, normal things that we all have to tolerate but you cannot, too oversensitive, too over-reactive, for him being called a name was such a terrible humiliation.

He never developed the ability to trust, he developed suspicion, never formed close relationships, to be able to have a close relationship with a woman.

I found he has a problem with alcohol, that's my opinion, and substance abuse problems, starting from a young age, that he—I think he [has] some depressive features of a depressive disorder, I think he had to turn off his ability to feel and when you turn off feeling pain, you also turn off feeling joy.

He never felt the joys, either, and it makes him unable—if you can't feel your own pain you can't feel other people's pain, you have to feel yours, and I think watching the tape, his mother said when he was ten he stopped at some point, he has stopped feeling, and that meant he couldn't feel other people's either, because if you can't feel someone else's pain you don't feel your own.

I think that he went from being—I think he sees himself as a failure in life, I think he views himself that way, I think he's always felt himself to be a failure, I think that the kind of suspiciousness you call paranoia comes from if you are constantly on guard, not knowing where the next attack is coming from, you have to be on guard for people, you have to be a [sic] watch, you mistrust their motives, people in your environment were not trustworthy, so I think that comes from this.

I think that he knows right from wrong in an abstract sense, but in his value sense, right from wrong his different because of what his parents taught him. And I think that he was clearly victimized and that's how he evolved into somebody who could behave as he's done recently.

A fair assessment of Dr. Kleinman's testimony was that it did not purport to express a clinical analysis or diagnosis in the sense of demonstrating that defendant had any particular mental illness, but was rather directed towards establishing that he had been the victim of severe abuse, which left him with a gravely inadequate personality and severely inappropriate behavioral characteristics. It assuredly was not proffered as an excuse for the murder. As a final question on direct, defense counsel asked Dr. Kleinman whether abused children will always grow up to be murderers. She responded:

I would tell you people who are severely abused in the same complex pattern Rigoberto had and the same family environment are prone to violence. Okay. They are going to be violent in some way. Some are violent in the families. He couldn't hack it enough even to have—he couldn't even have a relationship with a

woman. Otherwise, you might have seen the violence occur in the family with his own wife and children which is where it often goes.

There are lots of factors. ⁘ ⁘ ⁘ So that they may not all turn out to be murderers but they all—people who are abused as severely as Rigoberto was I would say all end up deeply disturbed.

Thus, the testimony of Dr. Kleinman did not place defendant's mental health at issue, nor was it offered for any purpose other than to explain defendant's personality and character as a basis for determining whether he deserved to die.

On cross-examination, Dr. Kleinman, to defense counsel's surprise, testified that she thought defendant suffered from "posttraumatic stress disorder" although she declined to make a definitive diagnosis. She also noted that he had traces of an antisocial personality disorder. Indeed, defense counsel specifically objected to that line of cross-examination, claiming that direct examination had not gone into any diagnostic opinions. The objection was overruled.

On surrebuttal, when asked, "is there research to support the conclusion that Mr. Mejia's behavior and personality came about as a result of suffering from some severe child abuse?" Dr. Kleinman responded, "Yes there is." She than went on to state, "... he was a victim of child abuse. And that his early family history accounts for his current behavior."

In sum, Dr. Kleinman's testimony was intended to demonstrate the horrendous circumstances of the defendant's childhood. That evidence was directed solely at the issue of whether the defendant deserved to die, not whether he was responsible for his actions or otherwise culpable. The testimony was directed toward mercy, not exoneration. Dr. Kleinman was clearly interested in establishing the nature and extent of the abuse the defendant suffered and in explaining the impact of abuse on a child's subsequent development. She did not make a definitive diagnosis of the defendant. To some extent, her testimony is susceptible to the interpretation that defendant's abusive childhood, inferentially, was a cause of his violent actions. However, measured against the thrust of her testimony, it is evident that the expert was not suggesting that

defendant had a mental condition that could serve as a medical cause, and legal excuse, for the murders. Nevertheless, as a result of the relatively slight turn in the defense testimony elicited during cross examination—which was immediately objected to by the defense but uncorrected by the court—the State then concentrated on disproving that either a mental disorder or an abusive childhood caused defendant to commit murder. The clear, and only, effect of that evidence was to convince the jury that defendant's abusive childhood, which was not itself disputed, should be disregarded or discounted not only as an excuse for murder, but as a reason to show mercy.

Dr. Michals testified that defendant did not suffer from post-traumatic stress disorder, depression, or an antisocial personality disorder. Dr. Michals also testified that whatever antisocial traits the defendant might possess, they would not inhibit him from "operating within a structured society or structured organization." He did not dispute the existence of defendant's abusive childhood. Dr. Coram's testimony was more pointed. He noted that the defendant suffered from multiple personality disorders and noted that "he may in fact be sociopathic." He also noted that the defendant was "always on alert possibly to act out against others." Finally, Dr. Coram offered his opinion that it was impossible to isolate the effect of one factor, such as child abuse, on the course of a person's subsequent behavior. He did not dispute the existence of childhood abuse but severely discounted it as a *cause* for murder.

Defendant characterizes that rebuttal testimony as a "penalty-phase gone dangerously awry." Whereas defendant sought to establish only the existence of severe child abuse and to comment on its relevance to the defendant's deathworthiness, the State responded by suggesting on the one hand that the defendant was in control of his behavior, *i.e.*, not mentally-ill, and on the other that he might be sociopathic—almost a calculated killer—and a danger to others. Defendant insists that the State's rebuttal miscasts the intent of the defendant's proffer of mitigating evi-

dence and in fact interjects non-statutory aggravating factors into the penalty trial. I agree.

In these circumstances, the trial court clearly should have given a limiting instruction, especially in light of the fact that defense counsel had so vehemently objected to the implications raised by the testimony elicited on cross-examination of Dr. Kleinman and by the admission of the State's rebuttal evidence. At a minimum, the testimony elicited on cross-examination should have been subject to a limiting instruction. It should not have been exacerbated and augmented through rebuttal testimony and further escalated through surrebuttal.

A trial judge has a heightened and non-delegable responsibility to ensure trial fairness, even when such an assurance can be met only by intervention. *See State v. Marshall, supra,* 123 *N.J.* at 232, 586 *A.*2d 85 (1991) (Handler, J., dissenting) (stating that capital trial elevates a court's supervisory duty to assure adherence to the prosecutor's particularly stringent ethical obligations in capital cases); *Biegenwald IV, supra,* 126 *N.J.* at 42, 594 *A.*2d 172 ("whatever lack of zealousness and vigor one might ascribe to defense counsel in no way diminishes trial court's duty to ensure that defendant is sentenced by a fair and impartial jury"); *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641 (stating that court has an obligation "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process").

Correct jury instructions are essential for a fair trial. *State v. Rhett,* 127 *N.J.* 3, 5, 601 *A.*2d 689 (1992); *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990); *State v. Concepcion,* 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988). The importance of a correct jury charge is enhanced in capital cases in light of the irreversibility of the penalty. *State v. Rose,* 112 *N.J.* 454, 508, 548 *A.*2d 1058 (1988); *State v. Brown,* 138 *N.J.* 481, 563, 651 *A.*2d 19 (1994) (Handler, J., dissenting).

Here, the court abrogated its obligation to assure a fair trial not only by admitting the rebuttal testimony over defense counsel's

objection, but also by failing to reduce and neutralize the harm by issuing a limiting instruction. The court should have recognized, in light of defense counsel's protestation, that the State's rebuttal testimony was unrelated to the mitigation testimony proffered by defendant and that a limiting instruction as to the jury's appropriate use of this testimony was warranted.

*Rose, supra,* involved the highly problematical use of "prior bad acts" as rebuttal to mitigating testimony of character witnesses in the penalty-phase of a capital case. This Court noted that in a "death penalty context, in the face of . . . abundant and inflammatory evidence . . . the necessity for a careful and precise limiting instruction . . . was clear and compelling." 112 *N.J.* at 508, 548 *A.*2d 1058.

This case presents a similar "clear and compelling" need for "careful and precise limiting instructions." Dr. Kleinman testified that the defendant's violent tendencies were precipitated from the domestic abuse he endured as a child. The State, on the other hand, did not actually rebut the mitigation of the existence and significance of an abusive childhood. Rather, it marshalled the other doctors to contradict Dr. Kleinman's statement that defendant suffered from a mental illness. Although Dr. Kleinman did state in vague terms that defendant did exhibit symptoms of a personality disorder, Dr. Kleinman did not purport to make a specific psychological diagnosis. Thus, the rebuttal did not directly challenge Dr. Kleinman's testimony that defendant was abused as a child, and that often times child abuse can lead to violent adult behavior. The effect of this expansive rebuttal testimony was that the jury was left to compare testimony of an abusive childhood and its long-term effects on defendant on the one hand with testimony that defendant's abusive childhood did not result in a personality disorder that could excuse defendant's murder on the other.

The problem with rationalizing these two evidentiary propositions is that the former is relevant for mitigation purposes, *i.e.,* it tends to support reasons why defendant should not be executed

for his crime, while the latter is both irrelevant to rebut such testimony and inadmissible to prove aggravation. Rather, this "rebuttal" testimony is the sort of testimony that would be relevant to disprove a diminished capacity or insanity defense. Its use in the penalty phase only left the jurors believing that defendant was trying to prove that he was not personally responsible for his actions. Because the jurors, having convicted defendant of murder, found that defendant's abusive childhood and its enduring effects could not excuse defendant's act of murder, there is no likelihood that it would believe those same factors would render defendant any less deserving to die for the murder. With defendant's mitigation successfully undermined, the jury was denied the opportunity to properly measure his culpability. That kind of injustice should have been addressed by the trial court and redressed, now, by this Court.

### III

For the additional reasons expressed here, I concur in the judgment of the Court, reversing defendant's murder conviction and death sentence.

HANDLER, J., concurs in the result.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.