**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1955-16T2

STATE OF NEW JERSEY
IN THE INTEREST OF I.G.S.

_____

Argued June 6, 2017 — Decided September 1, 2017

Before Judges Ostrer, Leone, and Vernoia.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FJ-20-869-16.

Kimberly L. Donnelly, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant State of New Jersey (Grace H. Park, Acting Union County Prosecutor, attorney; Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Susan Green, First Assistant Deputy Public Defender, argued the cause for respondent I.G.S. (Joseph E. Krakora, Public Defender, attorney; Ms. Green, of counsel and on the brief).

PER CURIAM

We granted the State leave to appeal a November 21, 2016 ruling suppressing juvenile I.G.S.'s statement to police. Because

the motion court premised its ruling on several legal errors, we vacate and remand for consideration free of those errors.

## I.

The following facts come from the motion court's opinion, the translated transcript of the video-recorded interview, and the hearing testimony. On April 6, 2016, the State received a referral from the Division of Child Protection and Permanency concerning allegations that I.G.S. committed a sexual assault against his six-year-old cousin J.G.

On April 8, 2016, Detective Keyla Live conducted a video-recorded interview of J.G., who said I.G.S. sexually assaulted her in his home. Live contacted I.G.S.'s mother and asked to take a statement from him because J.G. accused him of sexual assault. Live transported I.G.S. and his mother from his school to an interview room in the prosecutor's Child Advocacy Center. His mother remained with him throughout.

I.G.S. was fourteen years old and in the seventh grade. He and his mother had come to the United States from Guatemala in December 2015, and their native language was Spanish. I.G.S. knew how to read and write in Spanish and understood some English. Detective Live, a native Spanish speaker, conducted the entire interview in Spanish and used a Spanish-language juvenile-rights form.

Detective Live advised I.G.S. and his mother that J.G. alleged he touched her inappropriately, that Live wanted to talk to I.G.S. about that allegation, and that was why his mother was present. Live told I.G.S. and his mother that juveniles had rights in the United States and that I.G.S. should understand his rights before Live asked any questions.

Detective Live gave I.G.S. a juvenile-rights form written in Spanish and instructed him to read it aloud in Spanish and tell her if he understood his rights. Live also gave a copy of the Spanish-language juvenile-rights form to I.G.S.'s mother and confirmed that she could read Spanish.

I.G.S. read each of his rights aloud, was asked if he understood each one, and answered, wrote, and initialed that he understood each one. He confirmed orally and in writing he understood that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to have his mother, father, or guardian present before and during his interrogation.

I.G.S. also confirmed orally and in writing he understood that he had the right to consult and receive advice from an attorney before any questioning and to have an attorney present during the interrogation. I.G.S. further confirmed orally and in writing he understood that he had the right to consult and receive

A-1955-16T2

advice from an attorney even if he could not afford one and that if he wished to have an attorney and could not afford an attorney one would be appointed to represent him.

Additionally, I.G.S. confirmed orally and in writing he understood that he could decide at any time to exercise his rights and not answer any questions, that he knew what his rights were, that he knew and understood what he was doing, that no promises or threats had been made to him, and that he had not been pressured or coerced to waive his rights. When I.G.S. hesitated in reading the word "coerced," Detective Live asked if he knew what "coerced" meant, and then she defined it for him.

Detective Live asked I.G.S. to circle whether he did or did not want an attorney to be present during the interrogation. Live indicated it was I.G.S.'s decision, but I.G.S. "could speak with him [sic][1] . . . . [i]f you want to make the decision together." When I.G.S.'s mother replied they were going to speak with Live first, Live responded that I.G.S. also had to make the decision. I.G.S. said he would like an attorney present during the interrogation and asked his mother if that was what she wanted. His mother said no. Live asked I.G.S. again if that was what he wanted, and he said yes.

---

[1] The parties have treated this as a reference to I.G.S.'s mother. The transcript contains several pronouns which appear mistaken.

A-1955-16T2

As translated, Detective Live responded: "Okay.  You want an attorney.  Okay.  We cannot bring you an attorney now but you can find one with your mother.  We are done then."

I.G.S.'s mother reiterated she wanted Detective Live to speak to him.  Live responded:

> That is why I brought you [sic] here but if
> he wants an attorney before I speak with him,
> I cannot speak with him.  Understand me?  And
> I don't want him to feel like he is obligated
> to speak with me without, if he wishes to have
> an attorney, it is his right.  Do you want me
> to leave you alone and you can talk?

I.G.S.'s mother said yes.  Detective Live initially left I.G.S. and his mother alone in the interview room.  Then Live came back into the interview room and asked I.G.S. and his mother to talk in the empty hallway, where their conversation would not be recorded.  Live said: "When you finish knock on the door, okay. I am going to be on the other side."

After two minutes, I.G.S. and his mother knocked on the door. Detective Live asked what happened.  I.G.S.'s mother said he "would like for you to interrogate her [sic] . . . without an attorney present."  Live asked I.G.S. if he was sure, and he said yes. Live asked him if his mother was forcing him to do that, and he said no.  Live asked him if this was his own decision, and he said yes.

A-1955-16T2

On the Spanish-language juvenile-rights form, I.G.S. crossed out that he did, and circled that he did not, want an attorney to be present. He initialed the change, signed that he was willing to make a statement and answer questions without an attorney present during the interrogation, and put the date and time. His mother and Detective Live also signed and dated the form.

Detective Live asked if I.G.S. wanted his mother there when Live spoke with him, and he said yes. I.G.S. answered Live's questions. After initially denying anything occurred, I.G.S. eventually said his six-year-old cousin put her hand in his pants, he took his penis out, she caused him to ejaculate, and she had him put his penis on her buttocks.

A juvenile delinquency complaint was filed charging I.G.S. with aggravated sexual assault and sexual assault in violation of N.J.S.A. 2C:14-2(a)(1) and (b). He filed a motion to suppress, and the motion court held a Miranda[2] hearing. The court watched the video recording of the entire interview. The State called Detective Live, who testified I.G.S. waived his Miranda rights and gave his statement freely and voluntarily.

I.G.S. did not testify, but his mother testified as follows. She did not know I.G.S. could get a court-appointed attorney, and

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

she thought they would have to pay for an attorney. In the hallway, she told I.G.S. they did not have the money to hire an attorney, and he listened to her. If she had known he would get a court-appointed attorney, she would have told him to wait to get an attorney.

On cross-examination, I.G.S.'s mother said Detective Live gave her a copy of the Spanish-language rights form and that I.G.S. read and said he understood that "[i]f you would like a lawyer, and you can't afford one, you can ask the Court and you will be provided a lawyer to represent you." She testified "it was me who didn't quite understood [sic] that," but she did not voice any objections. On redirect, she said she did not understand the court would give them a lawyer, did not know where she would get a lawyer, and told I.G.S. "we can't afford a lawyer, you need to talk."

The motion court ruled Detective Live failed to follow proper procedures in administering the Miranda warnings. The court found Live's failures led to I.G.S.'s mother's "misunderstanding about the cost of legal representation that resulted in the juvenile-defendant's waiver of his right to counsel." Accordingly, the court concluded "the State has not met its burden in demonstrating that the juvenile-defendant's self-incriminating statements were a knowing, intelligent and voluntary waiver of his legal rights."

The State argues on appeal that the motion court erred in granting I.G.S.'s motion to suppress. We must hew to our standard of review. Generally, "appellate courts defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., ___ N.J. ___, ___ (2017) (slip op. at 16) (citation omitted). Appellate courts must also defer even to a trial court's "factfindings based solely on video or documentary evidence," because of its "experience and expertise in fulfilling the role of factfinder." Id. at ___ (slip op. at 23, 25). An appellate court need not defer "when factual findings are so clearly mistaken — so wide of the mark — that the interests of justice demand intervention," or when they "are not supported by sufficient credible evidence in the record." Id. at ___ (slip op. at 27).

By contrast, "legal conclusions are subject to de novo review." State v. Hreha, 217 N.J. 368, 382 (2014). "Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo — "with fresh eyes" — owing no deference to the interpretive conclusions' of trial courts,

'unless persuaded by their reasoning.'" S.S., supra, ___ N.J. at ___ (slip op. at 25) (citations omitted).

"[T]he framework for our trial courts to use when deciding whether a confession given by a juvenile in a custodial setting[3] was voluntary and therefore admissible in a delinquency proceeding" was established by State v. Presha, 163 N.J. 304 (2000). State ex rel. A.W., 212 N.J. 114, 116 (2012). "Although a suspect is always free to waive [Miranda rights] and confess to committing crimes, that waiver must never be the product of police coercion." Presha, supra, 163 N.J. at 313. Thus, "for a confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances. At the root of the inquiry is whether a suspect's will has been overborne by police conduct." Ibid. (citation omitted).

---

[3] Miranda warnings are required only "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." State v. Hubbard, 222 N.J. 249, 266 (2015) (quoting Miranda, supra, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706). "Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Ibid. (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275, 1279-80 (1983)). The parties and the motion court have apparently assumed that I.G.S. was in "custody" and that Miranda warnings were required. We make the same assumptions, without deciding the issue.

The motion court based its suppression decision on several legal rulings that Detective Live failed to follow proper procedures in administering <u>Miranda</u> warnings.  Those rulings were erroneous.

A.

First, the motion court erroneously ruled Detective Live erred by having I.G.S. read the <u>Miranda</u> rights aloud, rather than read them aloud to I.G.S.  <u>Miranda</u> did not require that police read the rights to the suspect but simply that the suspect "be warned" or be "informed" of those rights.  <u>Miranda</u>, <u>supra</u>, 384 <u>U.S.</u> at 444, 467-68, 471, 478-79, 86 <u>S. Ct.</u> at 1612, 1624, 1626, 1630, 16 <u>L. Ed.</u> 2d at 706-07, 720, 722, 726.  <u>Miranda</u> "warnings may be given either orally or in writing."  2 LaFave, Israel, King & Kerr, <u>Criminal Procedure</u> § 6.8(c), at 904 & nn.86-89 (4th ed. 2015) [hereinafter <u>LaFave</u>] (citing cases).[4]  "More commonly the

---

[4] "[N]umerous other courts have found that it is not essential that the warnings required by <u>Miranda</u> be given in oral rather than written form."  <u>State v. Strobel</u>, 596 <u>S.E.</u>2d 249, 253 (N.C. Ct. App. 2004), <u>cert. denied</u>, 545 <u>U.S.</u> 1140, 125 <u>S. Ct.</u> 2977, 162 <u>L. Ed.</u> 2d 889 (2005); <u>see, e.g.</u>, <u>United States v. Collins</u>, 40 <u>F.</u>3d 95, 98 (5th Cir. 1994), <u>cert. denied</u>, 514 <u>U.S.</u> 1121, 115 <u>S. Ct.</u> 1986, 131 <u>L. Ed.</u> 2d 873 (1995); <u>United States v. Alexander</u>, 441 <u>F.</u>2d 403, 404 (3d Cir. 1971); <u>State v. Olguin</u>, 165 <u>P.</u>3d 228, 230 (Ariz. Ct. App. 2007), <u>review denied</u> (2008); <u>Wise v. Commonwealth</u>, 422 <u>S.W.</u>3d 262, 271 n.4 (Ky. 2013); <u>People v. Warren</u>, 770 <u>N.Y.S.</u>2d

warnings are given orally by the officer reciting the provisions from a '<u>Miranda</u> card,'" but "giving the warnings in writing alone will suffice" if it is "shown that the defendant could and did read the warnings and that he acknowledged an understanding of them." <u>Id.</u> § 6.8(c), at 904. Indeed, our courts have repeatedly upheld waivers made by defendants who read their rights aloud.[5]

Here, the evidence showed I.G.S. "could and did read" the <u>Miranda</u> warnings because he read each warning aloud. Moreover, he acknowledged, orally and in writing, that he understood each warning.

The motion court asserted the Child Advocacy "Center's policy of having the accused read their <u>Miranda</u> rights is akin to a scholastic reading comprehension exercise." That is not a valid criticism. If I.G.S.'s reading of the <u>Miranda</u> warnings resulted in his comprehension of those warnings, it achieved the goal of

---

266, 267 (App. Div. 2003), <u>leave to appeal denied</u>, 777 <u>N.Y.S.</u>2d 34 (2004).

[5] <u>See, e.g.</u>, <u>State v. Adams</u>, 127 <u>N.J.</u> 438, 442, 450 (1992) (finding, where the detective "gave defendant a form to read," "defendant read the first line aloud to demonstrate literacy," and defendant "then read the rest to himself," that defendant's "waiver regarding oral statements was knowing, intelligent, and voluntary"); <u>State v. Messino</u>, 378 <u>N.J. Super.</u> 559, 575, 577 (App. Div.) (finding, where "defendant was given a copy of the prosecutor's form and he was asked to read it aloud," "that the warnings provided to defendant were sufficient to inform him of the substance of his constitutional rights"), <u>certif. denied</u>, 185 <u>N.J.</u> 297 (2005).

<u>Miranda</u>.  Moreover, having I.G.S. read the warnings aloud allowed Detective Live to see, hear, and correct indications I.G.S. did not understand what he was reading.  Thus, when I.G.S. hesitated when reading the word "coerced," Live was able to correctly explain the meaning of that word.

The motion court held that by having I.G.S. read the rights aloud, Detective Live violated "the legal duty incumbent upon law enforcement to read" the <u>Miranda</u> rights.  The court cited <u>State ex rel. A.S.</u>, 203 <u>N.J.</u> 131 (2010), but took a statement from that case out of context.  In <u>A.S.</u>, "[t]he police placed A.S.'s mother in the role of their helper from the outset of the interrogation process by making her read the child her rights."  <u>Id.</u> at 136. "[I]n less than a minute's time, [the mother] read the <u>Miranda</u> form to A.S.; there was no further explanation given to A.S. of her constitutional rights."  <u>Id.</u> at 150.  A.S. was not questioned about each right individually; rather, the mother read all of the rights and then "asked A.S. if she understood her rights.  A.S. nodded and said 'umm hmm.'"  <u>Id.</u> at 138.  "The police also failed to correct the mother's later misstatements about those rights[.]" <u>Id.</u> at 136, 150-51.

> Indeed, the detective abdicated his responsibility in that regard by having [the mother] read A.S. her rights, a procedure which tainted the interview from its outset and must not be utilized in the future.  It

12

> is a police officer's responsibility to read
> and to make sure that the juvenile understands
> his or her constitutional rights before
> proceeding with an interrogation.
>
> [Id. at 149-50.]

The motion court relied on the latter sentence. However, that sentence was part of the A.S. Court's "reject[ion of] the practice of having a child's parent be responsible for reading to the child his or her constitutional warnings," because "[t]he parent is not present to assume the role and responsibility of the police." Id. at 137, 150. Here, I.G.S.'s mother was not involved in the reading of the Miranda rights.

The motion court mistakenly read A.S. as barring officers from asking literate defendants to read their Miranda rights aloud. That issue was not presented in A.S., because A.S. was never asked to read her rights. Thus, the court erred in finding Live improperly had I.G.S. read his rights aloud.

### B.

Second, the motion court erroneously ruled Detective Live failed to ensure I.G.S. had the information required by Miranda when Live became "aware of the conflict between [his mother's] intent to have the interrogation proceed without counsel and the juvenile defendant's request for counsel." The court ruled it was "incumbent upon Det. Live to advise I.G.S. and [his mother] of

13

I.G.S.'s right to a court appointed attorney and of her duty not to proceed with the interrogation until they had spoken to counsel."

However, Detective Live did advise I.G.S. and his mother that if he "wishes to have an attorney, it is his right," that if he wanted an attorney "[w]e are done then," that "if he wants an attorney before I speak with him, I cannot speak with him," and that he was not "obligated to speak with me without" an attorney. Importantly, Live promptly terminated the interrogation.

Moreover, only moments before, Detective Live had ensured I.G.S. and his mother were informed of his right to court-appointed counsel. Live had I.G.S. read aloud in his mother's presence the juvenile form advising he had "the right to consult and receive advice from an attorney even if you cannot afford one. If you wish to have an attorney and cannot afford an attorney one will be appointed to represent you."

That warning complied with Miranda, supra, which requires that an officer convey to a defendant "that if he cannot afford an attorney one will be appointed for him." 384 U.S. at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726; accord, e.g., Berghuis v. Thompkins, 560 U.S. 370, 380, 130 S. Ct. 2250, 2259, 176 L. Ed. 2d 1098, 1110 (2010); State v. O'Driscoll, 215 N.J. 461, 476 (2013). That was also the appropriate warning for a juvenile

14                                                          A-1955-16T2

defendant: "the [juvenile] and his parents must be notified of [his] right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent [him]."  State ex rel. P.M.P., 200 N.J. 166, 175 (2009) (quoting In re Gault, 387 U.S. 1, 41, 87 S. Ct. 1428, 1451, 18 L. Ed. 2d 527, 554 (1967)).

The motion court erroneously faulted Detective Live and the juvenile form because they "did not specifically state that an attorney will be provided free of cost."  Such an elaboration is not required.  "Miranda v. Arizona does not require that a suspect be advised of or understand that he will not ultimately bear any liability for the cost of an attorney appointed to assist him during custodial interrogation[.]"  Sanchez v. People, 329 P.3d 253, 255, 258-61 (Colo. 2014) (citing cases); accord, e.g., Chambers v. Lockhart, 872 F.2d 274, 275 (8th Cir. 1989), cert. denied, 493 U.S. 938, 110 S. Ct. 335, 107 L. Ed. 2d 324 (1989); United States v. Montoya-Robles, 935 F. Supp. 1196, 1205 (D. Utah 1996); Batteaste v. State, 331 So. 2d 832, 834 (Ala. Crim. App. 1976); Commonwealth v. Hammer, 494 A.2d 1054, 1064 n.6 (Pa. 1985).

Our Supreme Court has found a knowing and intelligent waiver of Miranda rights even though the Spanish-language Miranda card stated: "You have the right to rent or hire an attorney."  State v. Mejia, 141 N.J. 475, 502-03 (1995).  The Court agreed the card

15                                                    A-1955-16T2

"could have more clearly apprised defendant of his right to a court-appointed lawyer free of cost." Id. at 503. The Court noted "[p]art of the problem is with the verb 'alquilar,' which means 'to let, hire, rent.'" Ibid. Nonetheless, the Court concluded that "[a]lthough the warning card might have used a better verb, we cannot say that the card misled Mejia." Ibid.

Here, the Spanish-language juvenile-rights form accurately conveyed the required warning. Indeed, the court reporter translated the form as advising: "If you would like a lawyer, and you can't afford one, you can ask the Court and you will be provided a lawyer to represent you." I.G.S. stated he understood his Miranda rights, and neither he nor his mother gave any indication they did not understand those rights. Therefore, the motion court erred in ruling Detective Live failed to give the appropriate Miranda warnings.

### C.

Third, the motion court erroneously ruled that, when I.G.S. and his mother disagreed on whether he should speak without an attorney, it was improper for Detective Live to ask them: "Do you want me to leave you [two] alone and you can talk?" However, our Supreme Court has held that "officers confronted with an ambiguous invocation are authorized to make inquiry in order to clarify the suspect's intent." State v. Diaz-Bridges, 208 N.J. 544, 569

16                                                        A-1955-16T2

(2012). "[I]f the words amount to even an ambiguous request for counsel, the questioning must cease, although clarification is permitted; if the statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed." State v. Alston, 204 N.J. 614, 624 (2011). "In permitting questions that are meant to clarify whether a Miranda right has been invoked, th[e] Court has reasoned that '[such questioning] is not considered "interrogation" under Miranda, because it is not intended to "elicit an incriminating response from the suspect."'" Id. at 623 (quoting State v. Johnson, 120 N.J. 263, 283 (1990)).

Clarification is proper "[w]hen a suspect's words are ambiguous." Ibid.; cf. id. at 618, 626 (analyzing whether the defendant's question to the interrogating officer "[s]hould I not have a lawyer in here with me?," was an ambiguous request for counsel). Ambiguity can also arise from the context in which the words are spoken. See State v. Chew, 150 N.J. 30, 63 (1997) (finding a defendant's request, as he was being arrested, "that his mother contact his attorney was an equivocal invocation of the right to counsel that had to be clarified before questioning could take place"). Here, the ambiguity arose from the fact that fourteen-year-old I.G.S. and his mother who was serving as his

adult advisor disagreed over whether he should invoke the right to counsel.

Our Supreme "Court has required that a parent have a reasonable opportunity to 'consult' with her child regarding any proposed waiver of <u>Miranda</u> rights." <u>State ex rel. A.S.</u>, 409 <u>N.J. Super.</u> 99, 112, 114 (App. Div. 2009), <u>rev'd on other grounds</u>, 203 <u>N.J.</u> 131 (2010). Such consultation with a parent is required because "juveniles need assistance in understanding and deciding whether to waive their rights." <u>A.W.</u>, <u>supra</u>, 212 <u>N.J.</u> at 133. That is particularly true for a younger juvenile. "[A] fourteen-year-old boy . . . . cannot be compared with an adult in full possession of h[er] senses" and needs "the aid of more mature judgment as to the steps he should take in the predicament in which he found himself." <u>A.S.</u>, <u>supra</u>, 203 <u>N.J.</u> at 149 (quoting <u>Gallegos v. Colorado</u>, 370 <u>U.S.</u> 49, 54, 82 <u>S. Ct.</u> 1209, 1212-13, 8 <u>L. Ed.</u> 2d 325, 328-29 (1962)).[6]

Our Supreme Court has stressed the "special significance" of "[t]he role of a parent in the context of a juvenile interrogation." <u>Presha</u>, <u>supra</u>, 163 <u>N.J.</u> at 314. "In that circumstance, the parent serves as advisor to the juvenile, someone

---

[6] Indeed, "[w]hen the juvenile is under the age of fourteen, the adult's absence will render the young offender's statement inadmissible as a matter of law — unless the adult is truly unavailable." <u>Presha</u>, <u>supra</u>, 163 <u>N.J.</u> at 322.

18

who can offer a measure of support in the unfamiliar setting of the police station."  Ibid.

> When younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
>
> [Id. at 315 (emphasis added).]

Accordingly, the Court in Presha held "a parent or legal guardian should be present in the interrogation room, whenever possible," and the presence or absence of the adult is "a highly significant factor."  Ibid.  "By elevating the significance of the adult's role in the overall balance, we are satisfied that the rights of juveniles will be protected in a manner consistent with constitutional guarantees and modern realities."  Ibid.; see A.W., supra, 212 N.J. at 129.

In light of the important role of the parent as a juvenile's advisor, the disagreement between fourteen-year-old I.G.S. and his mother over whether to invoke his right to counsel, and the absence of any opportunity for them to consult privately on the issue, it was appropriate for Detective Live to seek clarification by asking

if they wanted to consult with each other.[7]  If I.G.S. had said he wanted to be interrogated without counsel, and his mother said she wanted him to invoke his right to counsel, it would have been appropriate for Live to ask if the adult and the juvenile wanted to consult with each other.  It was equally appropriate in this situation, given the parent's advisory role.[8]

Nonetheless, the motion court ruled Detective "Live's language and conduct after the juvenile defendant's request for an attorney does not comport with the requirements of fundamental fairness."[9]  The court found Live violated that standard because "a parent may not waive any rights of a juvenile-defendant except

---

[7] I.G.S. argues if he was an adult, his invocation would have been unambiguous and final.  However, I.G.S. was only fourteen years old, his mother was serving as his advisor, and "the parent and child must have a reasonable opportunity to consult on such matters."  A.S., supra, 409 N.J. Super. at 112.

[8] I.G.S. argues parental advice and consultation is appropriate only if the parent favors invocation rather than cooperation.  His one-sided argument has been rejected by the Supreme Court in A.W. and A.S., as discussed infra.

[9] The motion court cited Presha for the proposition that the police are required to ensure that the interrogation of a juvenile is conducted in accordance with "the highest standard of fundamental fairness and due process."  However, Presha, supra, made clear that heightened requirement is added "when an adult is unavailable or declines to accompany the juvenile," and it has been applied only in that context.  163 N.J. at 317; see, e.g., A.W., supra, 212 N.J. at 130, 136; State ex rel. Q.N., 179 N.J. 165, 173 (2004); see also State ex rel. S. H., 61 N.J. 108, 115 (1972).

in the presence of and after consultation of counsel."  The court mistakenly relied on N.J.S.A. 2A:4A-39(b)(1) and P.M.P.

N.J.S.A. 2A:4A-39(b)(1) states:

> During every court proceeding in a delinquency case, the waiving of any right afforded to a juvenile shall be accomplished in the following manner: (1) A juvenile who is found to have mental capacity may not waive any rights except in the presence of and after consultation with counsel, and unless a parent has first been afforded a reasonable opportunity to consult with the juvenile and the juvenile's counsel regarding this decision.  The parent or guardian may not waive the rights of a juvenile found to have mental capacity.

N.J.S.A. 2A:4A-39(b)(1) applies only once the State has initiated "court proceeding[s] in a delinquency case," not before charges are filed.  Thus, P.M.P., supra, held N.J.S.A. 2A:4A-39(b)(1) applied after "the filing of the complaint and obtaining of a judicially approved arrest warrant by the Prosecutor's Office."  200 N.J. at 169; accord State v. Hodge, 426 N.J. Super. 321, 332 (App. Div. 2012) (explaining P.M.P. viewed those charging acts "as the functional equivalent of an indictment to which the right to counsel for an adult attaches").  Nothing in P.M.P. or N.J.S.A. 2A:4A-39(b)(1) suggests that an uncharged juvenile "may not waive any rights except in the presence of and after

consultation with counsel." Indeed, such waivers have been upheld by our Supreme Court in A.W., Q.N., and Presha.[10]

The motion court noted "the parent must be acting with the interests of the juvenile in mind." A.W., supra, 212 N.J. at 133 (quoting A.S., supra, 203 N.J. at 148). However, I.G.S.'s mother's advice that they "speak with [Detective Live] first" did not show she was not acting in I.G.S.'s interests. Like an attorney, a mother may advocate cooperation by a juvenile to build his credibility in the eyes of the police, clear up police misapprehensions about his conduct, or obtain favorable treatment for him.[11]

---

[10] Notably, even when N.J.S.A. 2A:4A-39(b)(1) applies, it requires that "a parent has first been afforded a reasonable opportunity to consult with the juvenile and the juvenile's counsel regarding th[e] decision" to waive rights. Moreover, as discussed infra, Detective Live recognized that the right to counsel belonged to I.G.S. and that his mother "may not waive" it for him. Ibid.

[11] In addition, parents traditionally may urge juveniles to cooperate "to teach integrity," to show "the decent thing is to come clean[ and] face the music," and because "[a] child can be rehabilitated only in the face of the truth." State ex rel. Carlo, 48 N.J. 224, 244 (1966) (Weintraub, C.J., concurring). In Presha, supra, the Supreme Court acknowledged that parental role but noted that "[w]ith the State's increased focus on the apprehension and prosecution of youthful offenders, the parent's role [as a buffer] in an interrogation setting takes on new significance." 163 N.J. at 314-15. However, those parental concerns remain legitimate if the parent has the interests of the juvenile in mind. See id. at 319-20 (holding that "[a] parent obviously enjoys a special relationship with the juvenile" distinct from that of an attorney).

As the Supreme Court recently reemphasized in <u>A.W.</u>, "parents are permitted to encourage their children to cooperate with the police." <u>Ibid.</u> The Court similarly stated in <u>A.S.</u>, <u>supra</u>:

> In order to serve as a buffer, the parent must be acting with the interests of the juvenile in mind. <u>That is not to say that a parent cannot advise his or her child to cooperate with the police or even to confess to the crime if the parent believes that the child in fact committed the criminal act.</u>
>
> [203 <u>N.J.</u> at 148 (emphasis added).]

Moreover, the Supreme Court in <u>A.S.</u> reaffirmed <u>Q.N.</u>, where the Court found the juvenile's confession was voluntary even though "Q.N.'s mother twice urged her son to confess to the suspected acts" by telling him: "I know you did this. Please answer the officer's questions." <u>Q.N.</u>, <u>supra</u>, 179 <u>N.J.</u> at 169, 177, 179. The Court in <u>A.S.</u>, <u>supra</u>, confirmed Q.N.'s "mother's 'urgings were consistent with her right as a parent to so advise her son.'" 203 <u>N.J.</u> at 148 (quoting <u>Q.N.</u>, <u>supra</u>, 179 <u>N.J.</u> at 177). The Court in <u>A.S.</u> reiterated the role of the parent was "to assist juveniles in understanding their rights[ and] acting intelligently in waiving those rights," as Q.N.'s mother had done. <u>Id.</u> at 150 (quoting <u>Presha</u>, <u>supra</u>, 163 <u>N.J.</u> at 315); <u>see</u> <u>Q.N.</u>, <u>supra</u>, 179 <u>N.J.</u> at 176.

I.G.S. tries to analogize this case to the very different facts of <u>A.S.</u> There, A.S.'s adoptive mother F.D. was the victim's

23                                                    A-1955-16T2

biological grandmother, and she took the side of the victim. Even before the police interrogation, F.D. confronted A.S., "accused A.S. of lying," and "grew so angry with A.S." that another person had to be "present to ensure that there was not an altercation between F.D. and A.S." A.S., supra, 203 N.J. at 138. Moreover, at the police interrogation, "F.D. was clearly angry." Id. at 144. As discussed in Section IIIA. above, F.D. "assume[d] the role and responsibility of the police" during the Miranda warnings, and made "misstatements of the law" thereafter,

> stating that "when the questions are asked you have to answer the question," which plainly contradicted A.S.'s right to remain silent. At other points during the interview, F.D. told A.S. that she must talk — must answer — which implied that even if A.S. requested an attorney, she nevertheless would have to answer the questions.
>
> [Id. at 150; see id. at 139-41.]

Moreover, during the interrogation in A.S., F.D. acted as the police's "helper," "assistant," and "agent" by being "an 'interrogator,'" aggressively questioning A.S., "badgering" her, "chastising her," repeatedly calling her "'a liar,'" and "press[ing] A.S." to confess even when A.S. did not want to talk. Id. at 136, 137, 141. F.D. again took the victim's side, faulting A.S. because she "didn't give [the victim] any rights," and

24                                                              A-1955-16T2

"ask[ing] A.S. why she would do this to [the victim] because he was just a baby." Id. at 139, 141.

The facts here bear no resemblance to the facts in A.S. There was no claim or evidence that I.G.S.'s mother was taking the side of the victim rather than I.G.S. I.G.S.'s mother evidenced no anger towards him and never badgered or chastised him. His mother played no role in giving the Miranda warnings, and made no misstatements of his rights. Moreover, I.G.S.'s mother was essentially silent during Detective Live's questioning, never asked him a question, called him a liar, or told him to answer or confess. Nothing in the record suggests I.G.S.'s mother had "competing and clashing interests in the subject of the interrogation" or that any such clash was "apparent to [the] interrogating officer[]." Id. at 155.[12]

Accordingly, Detective Live had no reason to doubt I.G.S.'s mother was appropriately serving as his advisor. Thus, the motion court erred in faulting Live for asking if I.G.S. and his mother

---

[12] Nonetheless, I.G.S. argues an attorney had to be present because his "immigrant mother was either unwilling or unable to serve the protective role." However, the Supreme Court in A.S., supra, rejected a per se rule requiring an attorney to be present even where the parent "is a suspect" or "is truly conflicted" because of "'a close family relationship' to . . . the victim." 203 N.J. at 154-55, 154 n.6.

wished to consult with each other in private to resolve their disagreement about whether or not to invoke the right to counsel.

### D.

Fourth, the motion court erroneously faulted Detective Live's instruction: "When you finish knock on the door, okay. I am going to be on the other side." The court ruled that "instructing the juvenile-defendant and [his mother] to knock when they were ready to discuss their decision is in fact initiating further communication with the juvenile-defendant after the right to counsel had been invoked." The court noted "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present." Minnick v. Mississippi, 498 U.S. 146, 153, 111 S. Ct. 486, 491, 112 L. Ed. 2d 489, 498 (1990).

Generally, "once a request for counsel has been made, an interrogation may not continue until either counsel is made available or the suspect initiates further communication sufficient to waive the right to counsel." Alston, supra, 204 N.J. at 620. The motion court ruled "[a]ny communication after [defendant] and his mother . . . returned to the interrogation room must be suppressed in order to give effect to the juvenile-defendant's affirmative request for counsel." However, it was "ambiguous" whether the right to counsel had been invoked, and

26                                                        A-1955-16T2

Detective Live properly sought clarification by asking if I.G.S. and his mother wanted to consult in private. Id. at 623-24.

After I.G.S.'s mother expressed a desire for consultation, Detective Live made appropriate arrangements for them to have privacy outside the video-recorded interview room. As that privacy placed I.G.S. and his mother on the other side of a door from Live, Live's instruction was a practical arrangement to enable them to tell her the result of their consultation about whether to invoke the right to counsel.[13]

The purpose of asking clarifying questions about an ambiguous invocation is to elicit a response about whether the right is being invoked. The officer must be able to receive the response in order to know whether or not the right is being invoked and thus whether or not questioning about the crime may proceed. See Johnson, supra, 120 N.J. at 283. Similarly, "when faced with an ambiguous assertion of a right, it is only through evaluation of clarifying follow-up inquiries and the responses to those

---

[13] Indeed, even if a suspect has clearly invoked the right to counsel, "police contacts which are insignificant, regarding unrelated matters, or made for other legitimate purposes concerning the case do not constitute such initiation." LaFave, supra, § 6.9(f), at 948; see, e.g., United States v. Comosona, 848 F.2d 1110, 1112 (10th Cir. 1988) (holding it was not reinitiation when, after Comosona's invocation of the right, an agent "handed Comosona a business card and invited Comosona to call him collect if he wished to speak further about the incident").

inquiries that a court can ensure that a waiver of defendant's right was given intentionally and voluntarily." Alston, supra, 204 N.J. at 623 (emphasis added).

Arranging to hear the response to the clarifying question is not police reinitiation of interrogation about the crime. Again, clarifying questioning "is not considered 'interrogation' under Miranda, because it is not intended to 'elicit an incriminating response from the suspect.'" Ibid. (quoting Johnson, supra, 120 N.J. at 283). That was evidenced here. When I.G.S. and his mother knocked on the door, Detective Live asked "[w]hat happened," and I.G.S. and his mother reported the result of their consultation concerning whether to invoke the right to counsel. Live confirmed I.G.S. wished to be interrogated without an attorney present before she commenced substantive questioning.

The motion court stressed that "[u]pon returning to the interrogation room, it was [I.G.S.'s mother] who stated, 'he would like you to interrogate him.'" However, there was nothing inappropriate in I.G.S.'s mother, as his adult advisor, conveying what "he would like." In any event, as the court acknowledged, "Detective Live had I.G.S. confirm that the decision to continue with the interrogation was his own."

Indeed, Detective Live made repeated efforts throughout to ensure the decision whether to waive counsel was made by I.G.S.

rather than his mother.  When I.G.S.'s mother first said they were going to speak to Live without counsel, Live told I.G.S. that whether to waive counsel "is your decision," that even if his mother wanted I.G.S. to speak with Live "you also have to make that decision," and that it depended on "what you decide."  Live also told I.G.S.'s mother "it is [I.G.S.'s] right," and "if he wants an attorney before I speak with him, I cannot speak with him."  When I.G.S. initially sought to invoke counsel and his mother disagreed, Live terminated the interrogation.  After they consulted, Live confirmed with I.G.S. that it was "his own decision" to speak without an attorney, that his "mother was not forcing him to do that," and that he was "sure about that" decision.  Live then went over the Spanish-language juvenile-rights form with I.G.S. to have him indicate his decision.  Therefore, Live properly asked I.G.S. and his mother to knock to tell Live the results of their clarifying consultation, and properly elicited I.G.S.'s ultimate decision.

IV.

Thus, the motion court mistakenly ruled Detective Live violated Miranda when she took the actions addressed above.  These mistaken rulings were central to the court's opinion. Accordingly, we must overturn that decision.

A-1955-16T2

The motion court also stated "the record indicates it was in fact [I.G.S.'s mother's] misunderstanding about the cost of legal representation that resulted in the juvenile-defendant's waiver of his right to counsel." However, I.G.S. and his mother had been advised: "You have the right to consult and receive advice from an attorney even if you cannot afford one. If you wish to have an attorney and cannot afford an attorney one will be appointed to represent you." Moreover, it is undisputed neither I.G.S. nor his mother revealed any misconceptions they allegedly had about I.G.S.'s right "that if he cannot afford an attorney one will be appointed for him." Miranda, supra, 384 U.S. at 473, 479, 86 S. Ct. at 1627, 1630, 16 L. Ed. 2d at 723, 726.

"The responsibility of law-enforcement authorities to inform defendants of their rights ends with the proper administration of Miranda warnings." State v. Adams, 127 N.J. 438, 448 (1992). "A police officer has no duty to probe for a defendant's unstated misconceptions about the effect of the waiver of Fifth Amendment rights." Id. at 449.

Such unrevealed misconceptions are not normally a basis for suppression. "It is fundamental . . . that once Miranda warnings have been given, a subsequent statement is not rendered involuntary or unintelligent merely because the defendant's decision to speak is founded upon some ill-conceived notion of the law." State v.

Freeman, 223 N.J. Super. 92, 105 (App. Div. 1988), certif. denied, 114 N.J. 525 (1989). Thus, in Adams, supra, our Supreme Court rejected suppression based on the defendant's alleged misapprehension that his oral statement would not be admissible, noting "the trial court found that Detective Thomas had properly advised defendant of his Fifth Amendment rights and that defendant understood them when he made his [oral] statement" and that "if defendant was confused about the legal effect of his making an oral statement, Detective Thomas was not the source of his confusion." 127 N.J. at 448, 450. Similarly, in State v. McKnight, 52 N.J. 35 (1968), our Supreme Court held a misapprehension about the right to counsel might not justify suppression:

> if a prisoner is told that he has a right to say nothing and that what he says may be used against him, and that he has a right to an attorney and to his presence during any interrogation, at public expense if he is indigent, the objective of Miranda is fully met. It is irrelevant that the prisoner, so advised, chooses to speak without counsel because he misconceives his need for aid or the utility of a lawyer.
>
> [Id. at 47.]

Detective Live did make one statement which I.G.S. now stresses as "the source of [I.G.S.'s alleged] confusion" about I.G.S.'s right to appointed counsel. See Adams, supra, 127 N.J.

at 450. When I.G.S. and his mother disagreed over whether to invoke the right to counsel, and Live said they were "done then," Live added: "We cannot bring you an attorney now but you can find one with your mother."[14]

It is undisputed the police were not required to bring I.G.S. an attorney.[15] However, he argues Detective Live's phrase "you can find one with your mother" obscured the right to have counsel appointed by the court. Live used the verb "buscar," whose translations include "ask for" as well as "seek."[16] Thus, the verb has meanings which arguably describe the processes for both hiring retained counsel and applying for appointed counsel. The motion court itself translated this phrase as "you need to get an attorney."

---

[14] Detective Live said in Spanish: "Nosotros no te podemos traer un abogado ahora pero tú con tu mami pueden buscar uno."

[15] Miranda, supra, rejected the idea "that each police station must have a 'station house lawyer' present at all times to advise prisoners." 384 U.S. at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724. The United States Supreme Court has held that "Miranda does not require that attorneys be producible on call" by the police, and that Miranda was not violated where a detective said, "[w]e have no way of giving you a lawyer, but one will be appointed for you." Duckworth v. Eagan, 492 U.S. 195, 198, 204, 109 S. Ct. 2875, 2881, 2887, 106 L. Ed. 2d 166, 174, 178 (1989) (emphasis omitted).

[16] Translation of "Buscar", Cambridge Dictionary, http://dictionary.cambridge.org/dictionary/spanish-english/buscar (last visited Aug. 21, 2017).

At the <u>Miranda</u> hearing, Detective Live agreed that "a court-appointed attorney would be provided to [I.G.S.]" and that "he does not have to find an attorney, whether it's appointed or not." I.G.S.'s mother testified she thought Live's phrase meant "you had to go out and find your attorney."[17] The motion court mentioned Live's statement but did not expressly evaluate it, instead focusing on Live's alleged violations of <u>Miranda</u> which we have rejected above.

We believe the propriety and effect of the "you can find one" phrase should be considered on remand, free of the mistaken view that Detective Live otherwise committed <u>Miranda</u> violations. In its discretion, the motion court may allow the presentation of additional testimony, including by I.G.S.

In evaluating the effect if any of the "find" phrase, the motion court should consider <u>Mejia</u>, <u>supra</u>, where our Supreme Court concluded that "[a]lthough the [Spanish-language] warning card might have used a better verb, we cannot say that the card misled Mejia." 141 <u>N.J.</u> at 503. The court should also bear in mind <u>Alston</u>, <u>supra</u>. When Alston asked "if I did want a lawyer in here with me how would I be able to get one in here with me?," the

---

[17] The motion court viewed I.G.S.'s mother as saying the phrase "meant she had to find and pay for an attorney," but she did not expressly so testify.

interrogating detective responded "that's on you." 204 <u>N.J.</u> at 618. In excluding Alston's confession, "the motion court concluded that the detective's response might have been misunderstood to mean that it was defendant's obligation to secure counsel on his own," and ruled that the detective was required "to reiterate that defendant had the right to have an attorney appointed if he could not afford one." <u>Id.</u> at 618-19. Our Supreme Court rejected that ruling, explaining "that interrogating officers, when engaged in communications with suspects, most often use language that is also more like that of the suspect than the precise and pristine elocutions of [an] Oxford don," so "a minute parsing of the words used might yield an inaccurate picture of what was meant." <u>Id.</u> at 627.

The motion court must

> assess the totality of circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, [previous encounters with the law,] advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."
>
> [<u>Presha</u>, <u>supra</u>, 163 <u>N.J.</u> at 313 (citation omitted); <u>e.g.</u>, <u>O.N.</u>, <u>supra</u>, 179 <u>N.J.</u> at 175-79.]

It must determine whether Detective Live's use of the phrase "you can find one" itself created a misapprehension on the part of

I.G.S. and his mother that they could not obtain court-appointed counsel and caused I.G.S. to waive his right to counsel. If Detective Live's use of the phrase did not have those effects, no other basis for suppression is apparent, given our rulings that Detective Live did not engage in any other improper activity.

The motion court found that I.G.S. "was fully under the control of his parent" and that "the record reveals subtle parental coercion by [I.G.S.'s mother] for I.G.S. to speak with Det. Live." However, that finding was apparently based on the testimony of I.G.S.'s mother that he "was an obedient child" and that he would and did "listen to" her advice. Such testimony must be considered in light of the mother's role to provide advice to her fourteen-year-old son under Presha and subsequent cases. It would thwart the parental role as advisor, particularly for younger juveniles, if an obedient child's listening to his parent's advice (whether to cooperate or invoke his rights) was invalid as coercion.

Moreover, "[t]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" Berghuis, supra, 560 U.S. at 387, 130 S. Ct. at 2263, 176 L. Ed. 2d at 1114 (quoting Colorado v. Connelly, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473, 486 (1986)); accord State v. Smith, 307 N.J. Super. 1, 10-11 (App. Div. 1997), certif. denied, 153 N.J. 216 (1998). "[C]oercive

police activity is a necessary predicate to [any] finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Smith, supra, 307 N.J. Super. at 10 (quoting Connelly, supra, 479 U.S. at 167, 107 S. Ct. at 522, 93 L. Ed. 2d at 484). "The exclusionary rule respecting involuntary confessions must be anchored to the reason for its existence." Id. at 14.

New Jersey courts have extended that principle to encompass situations where private parties have "obtained the confessing statements through force and the threats of force." State v. Kelly, 61 N.J. 283, 291-93 (1972) (agreeing that Miranda does not apply to interrogation by a private uniformed and armed security guard, but considering the defendant's allegation that the guard and others had coerced his confession by having "[his] arms twisted about where [his] shoulders were"); accord State v. Marczak, 344 N.J. Super. 388, 396-99 (App. Div. 2001) (considering the defendant's allegation that the male victim "had coerced her taped and written confessions by putting a knife to her throat and then putting a gun to her head"), certif. denied, 171 N.J. 44 (2002). No force, threats of force, or similar coercion were alleged here.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1955-16T2